# EXHIBIT B

1  CARNEY BATES & PULLIAM, PLLC
   Randall K. Pulliam (*pro hac vice* admission application forthcoming)
2  rpulliam@cbplaw.com
   519 West 7th St.
3  Little Rock, AR 72201
   Telephone: (501) 312-8500
4  Facsimile: (501) 312-8505

5  JACOBSON PHILLIPS, PLLC
   Joshua R. Jacobson (*pro hac vice* admission application forthcoming)
6  joshua@jacobsonphillips.com
7  2277 Lee Rd., Ste. B
   Winter Park, FL 32789
8  Telephone: (321) 447-6461

9  CONN LAW, PC
   Elliot Conn          Bar No. 279920
10 elliot@connlawpc.com
   100 Bush Street, Suite 1580
11 San Francisco, CA 94104
   Telephone: (415) 417-2780
12 Facsimile: (415) 358-4941

13 *Attorneys for Plaintiff Felix Ramirez and*
   *the Proposed Class*

14

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 3/18/2025 4:14 PM
Reviewed By: P. Hernandez
Case #25CV461322
Envelope: 18647718**

15        **IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

16           **IN AND FOR THE COUNTY OF SANTA CLARA**

17 FELIX RAMIREZ, individually, on behalf of     Case No.:  25CV461322
   all others similarly situated, and on behalf of
18 the general public,                           CLASS ACTION

19              Plaintiff,                        **COMPLAINT FOR DAMAGES AND
                                                  EQUITABLE RELIEF FOR
20      v.                                        VIOLATIONS OF:**
                                                      **(1) THE MILITARY LENDING
21 ACTIVEHOURS, INC. dba EARNIN; and                     ACT, 10 U.S.C. § 987, *et seq.*; and**
22 DOES 1-10, inclusive,                              **(2) THE TRUTH IN LENDING ACT,
                                                          15 U.S.C. § 1601, *et seq.***
23              Defendants.                        **Unlimited Civil Case**

24                                                **JURY TRIAL DEMANDED**

25

26

27

28

Plaintiff Felix Ramirez, a Sergeant, on behalf of himself and all others similarly situated, and on behalf of the general public, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against ActiveHours, Inc. d.b.a. EarnIn ("EarnIn" or "Defendant") and DOES 1 through 10, inclusive, and alleges as follows:

## NATURE OF THIS ACTION

1. This Complaint seeks to protect active-duty military service members from EarnIn's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, EarnIn makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

2. EarnIn is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay EarnIn principal and finance charges (including expedite fees and so-called "tips") on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as "0% interest" and promising "no mandatory fees," in practice, EarnIn takes in finance charges of on average **284%** on loans it issues. These annual percentage rates ("APR") can reach even greater heights, with one of its loans to Plaintiff exceeding **1,458%** APR. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

3. Plaintiff, a Sergeant, has used EarnIn's Cash Out product for years. By virtue of the sky-high fees charged for early access to his salary, EarnIn has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA and TILA.

4.      Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's "Cash Out" transactions are in reality consumer credit.

5.      In violation of the MLA, Defendant uses its "Cash Out" product to saddle Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.      EarnIn's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any required MLA Disclosures; (3) including a Class Action Ban and Waiver of Jury Trial; and (4) including a mandatory binding arbitration clause. 10 U.S.C. §§ 987(b), (c) & (e)(1)(2)(5)(6).

7.      EarnIn systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

8.      Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

9.      EarnIn's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. Plaintiff Ramirez seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## PARTIES

10.      Plaintiff Sergeant Ramirez is an individual, over 18 years of age. At all times relevant, Sergeant Ramirez was a natural person and citizen of Jacksonville, North Carolina. He has been a member of the United States Marine Corps since 2019. During the class period, Sergeant Ramirez was a Covered Member and an active-duty service member employed by the United States Marine Corps.

11.      Defendant EarnIn is a Delaware corporation with its principal place of business in Santa Clara County, California. EarnIn has offered loan agreements to consumers, including Covered Members, since at least 2014, entering into millions of credit transactions.

12.      Defendants DOES 1 through 10 are persons or entities whose true names and capacities are presently unknown to Plaintiff and who therefore are sued by such fictitious names. Plaintiff is informed and believes and thereon allege that each of the fictitiously named Defendants perpetrated some or all of the wrongful acts alleged herein, are responsible in some manner for the matters alleged herein, and are jointly and severally liable to Plaintiff. Plaintiff will seek leave of court to amend this complaint to state the true names and capacities of such fictitiously named Defendants when ascertained.

## TOLLING OF THE STATUTE OF LIMITATIONS

13.      The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Sergeant Ramirez, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

CLASS ACTION COMPLAINT AND JURY DEMAND

# JURISDICTION AND VENUE

14.     Venue is proper in the County of Santa Clara because Defendant EarnIn is headquartered in Santa Clara County, coordinated business operations in California, did business in California and in Santa Clara County, and committed the wrongful acts alleged herein in Santa Clara County.

15.     This Court has jurisdiction over EarnIn, because it, at all times relevant herein, was qualified to do business and regularly conducted business in California.

16.     Furthermore, the terms of service provided on EarnIn's website states: "for any Claims not subject to arbitration, the exclusive jurisdiction and venue for any Claims will be the state and federal courts located in Santa Clara County, California, and each of you, EarnIn, and EarnIn's service providers consent to the personal and exclusive jurisdiction of, and venue in, such courts."

# LEGAL BACKGROUND

## The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

17.     The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

18.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit

---

[5] Report, *supra* n.1.
[6] *Id.* at 10–11.
[7] *Id.* at 11.

CLASS ACTION COMPLAINT AND JURY DEMAND

of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

19.    While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[9] Those loans, like EarnIn's, "are delivered and collected online through electronic fund transfer."[10]

20.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate EarnIn's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

---

[8] *Id.* at 14. To be sure, EWA providers like EarnIn do not collect physical checks from their customers at loan initiation, but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

[9] *Id.* at 15.

[10] *Id.* at 16.

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.

CLASS ACTION COMPLAINT AND JURY DEMAND

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

21.     The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

22.     Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

23.     To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[16]

---

[12] *Id.* at 21–22.
[13] *Id.* at 39.
[14] *Id.* at 41–42.
[15] *Id.* at 46.
[16] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

CLASS ACTION COMPLAINT AND JURY DEMAND

24.     The American Bar Association and Navy-Marine Corps Relief Society likewise submitted letters in support of the DoD's request, noting the "urgent need for remedial Congressional action" to curb predatory loan practices harming Service members.[17]

25.     Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

## The Military Lending Act

26.     In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

27.     The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

28.     The MLA also requires mandatory disclosures in "consumer credit"[18] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);
- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and
- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

29.     Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Members to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

30.     The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

---

[17] *Id.* at 54–56.

[18] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

## The Truth in Lending Act

31.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

32.     Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those EarnIn offers here. EarnIn fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *Id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *Id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *Id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *Id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *Id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or

otherwise, if the obligation involves a precomputed finance charge," *Id.* at §
1638(11); and

- "A statement that the consumer should refer to the appropriate contract document
  for any information such document provides about nonpayment, default, the right
  to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.* at
  § 1638(12).

## **FACTS**

### **The Earned Wage Product Market and EarnIn**

#### **EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

33.     A significant driver of demand for consumer credit and financial products stems
from the mismatch between when a family receives income and when they pay expenses.
Employees generally provide services before being paid for their labor and are typically paid in
arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for
years turned to credit cards, personal installment loans, and payday loans.

34.     Recently, an old product with new packaging—coined "earned wage access" or
"earned wage advance" ("EWA")—has been created and offered to consumers to address the
same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA
products are garden variety cash advances.

35.     EWA products provide workers, before their payday, with a portion of their earned
but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages.
Loaned funds are repaid via automated withdrawal from the consumer's bank account.

36.     Defendant EarnIn is one such fintech company that provides an EWA service,
which it calls "Cash Out." The Cash Out service enables EarnIn customers to "access certain
forms of [their] income, such as [their] earned wages . . . , prior to when that income is deposited
into [their] eligible bank account by requesting an advance of that income from EarnIn[.]"[19]

37.     To repay these loans, users must "link that bank account to your EarnIn profile

---

[19] *Cash Out User Agreement*, EARNIN, https://www.earnin.com/privacyandterms/cash-out/terms-
of-service#overviewNew (effective Jan. 15, 2025).

[and] authorize debits from your Bank Account or another eligible bank account."[20]

38.     EWA providers advertise their products as "free" or "0% interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

39.     EWA providers, including EarnIn, are generally paid through two types of fees: (1) expedite fees, and (2) through so-called "tips."

40.     First, **expedite fees** (referred to by EarnIn as "Lightning Speed Fees") are charged to provide instant access to loan funds. For its "Cash Out" product, EarnIn charges $3.99 for instant access to loans of $100 or less and $5.99 for loans between $100 and $150.

41.     Before 2022, EarnIn did not charge users to obtain the advertised version of its product, and users could obtain advances immediately, and use them for their advertised and intended purpose without paying an additional charge.

42.     The actual cost to provide customers with instant access to funds is less than $0.05.[21]

43.     The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

44.     EarnIn's website includes numerous representations about the speed of access to funds, like:

- "Get money in your bank in minutes with Lightning Speed"
- "Make any day payday"
- "Now payday can be any day"
- "Get paid today"
- "Life doesn't happen biweekly—neither should payday"[22]

---

[20] *Id.*

[21] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

[22] EarnIn Website, app2.earnin.com (last visited Mar. 9, 2025).

45. While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of an advance usually takes 1–3 banking days for users to receive, while the expedited service takes just a few minutes. This delay is problematic for EarnIn's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

46. Indeed, a recent study found that the average loan term for EWA Cash Out loans provided by EarnIn was only 8.8 days.[23] Consumers who cannot wait nine days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[24]

47. Turning to the second type of fee, "**tips**" are simply additional funds the lender prompts the user to pay.

48. These purported "tips" serve no purpose whatsoever to EarnIn customers and instead go directly to EarnIn's bottom line.

49. EWA providers like EarnIn deploy techniques borrowed from behavioral economics to pressure users into tipping each time they obtain an EWA loan. For example, the California's Department of Financial Protection and Innovation ("DFPI") listed "multiple strategies that lenders use to make tips almost as certain as required fees," including "[s]etting default tips and using other user interface elements to mak[e] tipping hard to avoid; [m]aking it difficult to set a $0 tip or not advertising that a particular payment is optional; and [c]laiming that

---

[23] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").
[24] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

CLASS ACTION COMPLAINT AND JURY DEMAND

tips are used to help other vulnerable consumers or for charitable contributions."[25]

50. EarnIn weaponizes each of these strategies against its customers to secure tips, and to great effect. A recent data summary found EWA providers that request tips receive them in 73% of transactions, on average $4.09 in tips per transaction.[26] A few examples of tip screens EarnIn shows its customers are given below:




[25] *2021 Earned Wage Access Findings*, Cal. Dep't Fin. Protec. & Innovation, at 61–62 (March 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf (hereinafter "DFPI Findings")
[26] *Id.*





51. EarnIn has said in public testimony that 40% of its revenue comes from tips alone.[27]

52. When properly viewing EWA products' tips and expedite fees as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

53. A recent study found the average APR imposed by EWA providers (that collect tips and expedite fees) is 334%, in line with payday loans:

---

**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

**Wage-based cash advances that don't request tips**
331%

**Wage-based cash advances that request tips**
334%

Payday loans
353%

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

54.     The APR received by EarnIn for its Cash Out product is similar. In a study that analyzed a sample of thousands of EarnIn transactions between 2022 and 2023, the Center for Responsible Lending ("CRL") found the average EarnIn loan was for $83.00, cost the consumer $5.00 in fees, and had an 8.8 day duration yielding an astonishing **284%** APR.[28] As discussed *infra*, some of EarnIn's loans to Plaintiff were even more expensive, with APRs as high as **1,458%**. *See infra*.

55.     Ironically, EarnIn and other industry participants market their products as a low-cost alternative to payday loans.[29] In truth, EarnIn is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loan products it claims to replace.

56.     On top of charging loan-shark interest rates, EarnIn and others limit the amount a borrower can access per day, while simultaneously allowing multiple advances per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips. EarnIn, specifically, allows users to obtain loans for no more than "$150/day (with a max of $750 per pay period)[.]"[30] These limits have grown over time.

---

[28] *Not Free*, *supra* note 23, at 5–10.
[29] *The EarnIn Origin Story*, YOUTUBE: EARNIN (July 26, 2024), https://www.youtube.com/watch?v=PqS-J5T_FDo (describing EarnIn instant cash EWA product as an alternative to "payday loans" and as helping consumers avoid "overdraft fees").
[30] EarnIn Website, https://www.earnin.com/products/cashout (last visited Mar. 9, 2025)

CLASS ACTION COMPLAINT AND JURY DEMAND

57.     This architecture maximizes fees for EWA providers like EarnIn, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[31]

58.     The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

59.     A CRL analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[32] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

60.     Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[33]

**EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

61.     While EWA products are financially disastrous for customers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting

---

[31] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").
[32] *Loan Shark*, *supra* note 31, at 7.
[33] *Not Free*, *supra* note 23, at 6.

CLASS ACTION COMPLAINT AND JURY DEMAND

underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

62.     EarnIn has various criteria borrowers must meet to be eligible for a cash advance. For instance, prospective borrowers must earn at least $320 each pay period to receive an EarnIn Cash Out advance. EarnIn takes steps to verify its customers' consistent income by requiring that borrowers link their financial accounts to the EarnIn app.

63.     To determine whether a borrower is creditworthy, and decide how much credit to extend in the first place, EarnIn requires users to connect their accounts to Earnin through Plaid. Plaid partners with EarnIn and other fintech companies to allow them to view data in customers' accounts. Plaid allows EarnIn to "[q]uickly verify assets and income" of EarnIn users, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[34]

64.     EarnIn uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits for the payday immediately following any given loan, ensuring their loans are paid as soon as funds become available.

65.     EarnIn's underwriting process is both detailed and ongoing. EarnIn continually adjusts maximum withdrawal amounts—both daily and per pay period—depending on the individual's borrowing history and financial health (as gleaned through Plaid). In determining how much credit to extend, EarnIn considers "a variety of factors including [borrowers'] bank balance, spending behavior, repayment history, and income."[35]

---

[34] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 11, 2025).
[35] *Cash Out FAQ: How much can I access per pay period?*, earnin.com, https://www.earnin.com/products/cashout#:~:text=Do%20I%20have%20to%20be,pay%20period%20to%20use%20EarnIn. (last visited Mar. 16, 2025).

CLASS ACTION COMPLAINT AND JURY DEMAND

66.     For borrowers who qualify, EarnIn monitors their financial health to determine how much credit to extend based on borrowers' need and ability to repay.[36] Through its constant underwriting process, EarnIn extends loans to borrowers only when it is confident they will repay.

67.     For qualifying borrowers, EarnIn generally begins by offering relatively low amounts of credit, between "$50 and $250 on average when signing up." Borrowers obtain greater access to credit—*i.e.*, EarnIn raises their maximum loan limit—by consistently paying off loans to EarnIn on time and generally improving their financial health (which EarnIn monitors through the borrowers' bank balance, spending behavior, repayment history, and income).[37]

68.     These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[38] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like EarnIn directly review borrowers' financial accounts—is one without a difference.

69.     In addition to these loan qualification procedures, borrowers must also link a checking account to their EarnIn profile to ensure seamless repayment.

---

[36] *Cash Out FAQ: How long does it take to see a higher pay period Max?*, earnin.com, https://www.earnin.com/products/cashout#:~:text=Do%20I%20have%20to%20be,pay%20period%20to%20use%20EarnIn. (last visited Mar. 16, 2025) ("Your pay period Max is evaluated each pay period.").
[37] *Id.* ("Most customers receive a Pay Period Max increase within their first two pay periods. Good financial habits, such as keeping a positive bank balance and managing spending, contribute to Pay Period Max increase. The Pay Period Max is capped at $750.").
[38] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

CLASS ACTION COMPLAINT AND JURY DEMAND

70. EarnIn represents on its website and in its app that cash advances must be repaid "when your paycheck hits" and that repayments are "due to EarnIn on payday."[39] Failure to pay back a Cash Out loan results in suspension of the borrower's EarnIn account.

71. In sum, EarnIn's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they are employed and regularly paid through that employment; (2) be paid at least $320 per pay period through that employment (3) link the bank account to which paychecks are deposited to EarnIn's app through Plaid; (4) authorize EarnIn to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees and tips; and (5) be current on all prior EarnIn Cash Out loans. Borrowers who fail to complete these steps cannot obtain cash advances.

72. Additionally, if a customer is unable to repay a loan, EarnIn prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

73. Through these underwriting procedures and policies, EarnIn ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's employer deposits the borrower's next paycheck.

74. These debt collection methods are so successful that lenders recoup their advances at least 97% of the time using these tactics.[40]

**EarnIn's Loans to Plaintiff**

75. Sergeant Ramirez is currently an active-duty Sergeant stationed at Camp Lejeune in North Carolina.

76. He has been an active-duty servicemember since September of 2019 and will remain on active-duty until at least May of 2025.

---

[39] EarnIn further states in its terms of service: "To repay Cash Out Services, you must authorize debits from your Bank Account or another eligible bank account."

[40] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

CLASS ACTION COMPLAINT AND JURY DEMAND

77. EarnIn extended consumer credit to Plaintiff in the form of "Cash Out" transactions like those discussed above.

78. Plaintiff used the loans from EarnIn for personal, family, or household purposes.

79. Plaintiff paid EarnIn's finance charges, in the form of lightning speed fees and tips, to obtain cash-advance loans from EarnIn.

80. A small selection of "CashOut" loans made by EarnIn to Plaintiff are shown in the below table, with the cost of credit and APR included:

| Date | Principal Amt. | Tips/Lightning Fees/Total | Loan Period | APR |
|------|------|------|------|------|
| 4/3/22–4/12/22 | $50.00 | $5.00/$2.99/$7.99 | 9 days | 648% |
| 7/4/22–7/13/22 | $50.00 | $8.00/$2.99/$10.99 | 9 days | 891% |
| 1/28/24–1/30/24 | $100.00 | $4.00/$3.99/$7.99 | 2 days | 1,458% |
| 5/19/24–5/29/24 | $100.00 | $1.00/$3.99/$4.99 | 10 days | 182% |
| 1/29/25–2/12/25 | $150.00 | $1.00/$5.99/$6.99 | 14 days | 121% |

81. Sergeant Ramirez has received dozens of usurious loans from EarnIn since he started using the service in 2021. In 2024 alone, Sergeant Ramirez took out **eighty-nine** loans, paying interest rates that dwarf the 36% MLA cap.

82. The "Lightning Speed" fees and tips are immediately and directly connected to EarnIn's extensions of credit to Plaintiff.

83. Further, EarnIn's credit agreement required Sergeant Ramirez to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

84. EarnIn's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

**EarnIn Violates the MLA and the TILA**

85. The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit." 32

C.F.R. § 232.4.

86. A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

87. Sergeant Ramirez and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 C.F.R. §§ 232.3(g)(2), (g)(3)).

88. Sergeant Ramirez is a Covered Member with respect to his loan agreements with EarnIn because he took out the loan while an active-duty service member for personal, family or household purposes.

89. EarnIn is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Members. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

90. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

91. EarnIn violates the MLA in at least four distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any required MLA Disclosures; (3) including a Class Action Ban and Waiver of Jury Trial which is prohibited by the MLA; and (4) including a mandatory binding arbitration clause. See, 10 U.S.C. §§ 987(b), (c), (e)(2), (e)(6)–(7).

92. As a result of EarnIn's failure to provide substantially any of the disclosures required by TILA, EarnIn also violates 15 U.S.C. § 1638.

//

//

## CLASS ACTION ALLEGATIONS

93.      Plaintiff brings this class action on behalf of himself and all other persons similarly situated and the general public. The proposed "MLA Class" and the "TILA Class" (collectively the "Classes") are defined as follows:

> **MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with EarnIn to use its "Cash Out" product, in which EarnIn was paid a finance charge (including, without limitation, a lightning speed fee or tip).

> **TILA Class**: All individuals in the United States that entered into an agreement with EarnIn to use its "Cash Out" product, in which EarnIn was paid a finance charge (including, without limitation, a lightning speed fee or tip).

94.      Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) EarnIn and any entity in which EarnIn has a controlling interest, or which has a controlling interest in EarnIn, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

95.      Sergeant Ramirez reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

### Numerosity and Ascertainability

96.      Plaintiff is unable to state the precise number of members of the classes because such information is in the exclusive control of EarnIn. EarnIn's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable. EarnIn has made millions of loans, and Sergeant Ramirez estimates there are, at least many thousands of consumers in the MLA Class and TILA Class. As a result, Plaintiff believes that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of EarnIn.

97.      The disposition of the claims of these Class members in a single action will

provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in EarnIn's possession, custody, or control.

## Commonality

98.     There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that EarnIn has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

    a.  Whether Sergeant Ramirez and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;

    b.  Whether EarnIn is a "creditor" subject to the protections and limitations of the MLA;

    c.  Whether EarnIn's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

    d.  Whether EarnIn entered into standard form loan agreements with Covered Members;

    e.  Whether EarnIn's loans exceed the MLA statutory rate cap of 36% MAPR;

    f.  Whether EarnIn failed to provide required credit disclosures in violation of the MLA;

    g.  Whether EarnIn's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

    h.  Whether EarnIn's standard form loan agreements contain an arbitration clause in violation of the MLA;

    i.  Whether EarnIn failed to provide required credit disclosures in violation of TILA;

    j.  Whether each month EarnIn charged interest to Sergeant Ramirez and Class Members it restarted the statute of limitations under the MLA;

    k.  Whether each month that Sergeant Ramirez and the Class Members paid money to EarnIn it restarted the statute of limitations under the MLA;

    l.  Whether Class members are entitled to actual or statutory damages for the

aforementioned violations and, if so, in what amounts;

m.  Whether EarnIn should be enjoined from continuing its lending practices in the manner challenged herein;

n.  Whether EarnIn is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Sergeant Ramirez and the Class are entitled under 10 U.S.C. § 987(f)(5); and

o.  Any declaratory and/or injunctive relief to which the Classes are entitled.

**Typicality**

99.  The claims and defenses of Sergeant Ramirez are typical of the claims and defenses of the MLA Class because Sergeant Ramirez is a Covered Member and loan agreements with EarnIn are typical of the type of personal, household, or family loans that EarnIn normally provides to Covered Members. Additionally, EarnIn uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of Sergeant Ramirez are typical of the claims and defenses of the TILA Class. Sergeant Ramirez suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the Classes.

**Adequate Representation**

100.  Sergeant Ramirez will fairly and adequately assert and protect the interests of the Classes. Sergeant Ramirez has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Sergeant Ramirez has no conflict of interest that will interfere with maintenance of this class action.

101.  Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Classes.

**Predominance and Superiority**

102.  The common questions of law and fact set forth herein predominate over any

questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

a. The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

b. Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

c. The claims of the individual Class members are small in relation to the expenses of individual litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, recover.

103.    The proposed Classes fulfill the certification criteria of Code of Civil Procedure § 382.

### FIRST CAUSE OF ACTION
#### (Violations of the Military Lending Act, 10 U.S.C. § 987, *et seq*.)
#### (On Behalf of Plaintiff and the MLA Class against Defendant EarnIn and applicable DOES)

104.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1-103 above.

105.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

106.    A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

107.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

108. Sergeant Ramirez and the MLA Class Members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 C.F.R. §§ 232.3(g)(2), (g)(3)).

109. Sergeant Ramirez is considered a "Covered Member" with respect to his EarnIn loan agreements because Sergeant Ramirez is an active-duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

110. EarnIn is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Member protected by the MLA. 10 U.S.C. § 987(i)(5); see also 32 C.F.R. § 232.3(i).

111. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

112. EarnIn charged Sergeant Ramirez and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

113. EarnIn fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

114. EarnIn's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

115. EarnIn's standard form loan agreements include class action waivers and jury trial waivers in violation of 10 U.S.C. § 987(e)(2)

116. As a result, EarnIn violates 10 U.S.C. § 987.

117. Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiff seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. §

987(f)(5)(A).

118.     Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiff prays for relief as set forth below.

**SECOND CAUSE OF ACTION**
**(Violations of the Truth In Lending Act, 15 U.S.C. § 1601,** *et seq.***)**
**(On Behalf of Plaintiff and the TILA Class against Defendant EarnIn and applicable DOES)**

119.     Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1-103 above.

120.     TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. EarnIn's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

121.     Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

122.     EarnIn is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

123.     EarnIn has not provided such disclosures before consummation of the loan agreements.

124.     EarnIn failed to provide such disclosures to Sergeant Ramirez and the TILA Class.

125.     As a result, EarnIn violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

126.     Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiff seeks an order from the Court awarding actual damages and statutory damages and attorneys' fees

and costs.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of the Classes, Plaintiff prays for judgment against EarnIn as follows:

a.  That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b.  That the Court enter judgment against EarnIn and in favor of Plaintiff and the Classes on all counts;

c.  That the Court find and declare that Sergeant Ramirez and MLA Class Members' standard form loan agreements violate the MLA;

d.  That the Court find and declare that EarnIn violated the MLA and award Sergeant Ramirez and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e.  That the Court award Sergeant Ramirez and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f.  That the Court find and declare that EarnIn violated TILA and award Sergeant Ramirez and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

g.  That the Court enjoin EarnIn from continuing to engage in predatory lending practices in violation of the MLA and TILA;

h.  That EarnIn be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that EarnIn be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

i.  That the Court award interest as allowable by law;

j.  That the Court award reasonable attorneys' fees as provided by applicable law,

including under the MILA, the TILA, and/or Code of Civil Procedure § 1021.5;

k.   That the Court award all costs of suit; and

l.   That the Court award such other and further relief as the Court may deem just and proper.

Dated:  March 18, 2025                    Respectfully submitted,

CONN LAW, PC

_____
Elliot Conn
*Attorneys for Plaintiff FELIX RAMIREZ and the Proposed Class*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury of each and every cause of action so triable.


Dated: March 18, 2025                              Respectfully submitted,

CONN LAW, PC


_____
Elliot Conn

*Attorneys for Plaintiff FELIX RAMIREZ*
*and the Proposed Class*