1  CARNEY BATES & PULLIAM, PLLC
   Randall K. Pulliam (*pro hac vice*)
2  rpulliam@cbplaw.com
   519 West 7th St.
3  Little Rock, AR 72201
   Telephone:  (501) 312-8500
4  Facsimile:  (501) 312-8505

5  JACOBSON PHILLIPS, PLLC
   Joshua R. Jacobson (*pro hac vice*)
6  joshua@jacobsonphillips.com
   2277 Lee Rd., Ste. B
7  Winter Park, FL 32789
   Telephone: (321) 447-6461
8

9  CONN LAW, PC
   Elliot Conn, California Bar No. 279920
10 elliot@connlawpc.com
   100 Bush Street, Suite 1580
11 San Francisco, CA 94104
   Telephone: (415) 417-2780
12 Facsimile: (415) 358-4941

13 *Attorneys for Plaintiffs Felix Ramirez, Michael Collins, and*
   *the Proposed Class*

14

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                    SAN JOSE DIVISION

18 | FELIX RAMIREZ, and MICHAEL COLLINS, | Case No.: 5:25-cv-03625-PCP |
   individually, on behalf of all others similarly
19 situated, and on behalf of the general public, | **AMENDED COMPLAINT FOR**
                                                   | **DAMAGES AND EQUITABLE RELIEF**
20              Plaintiffs,                        | **FOR VIOLATIONS OF:**
                                                   |   (1) **THE MILITARY LENDING**
21        v.                                       |       **ACT, 10 U.S.C. § 987, *et seq.*;**
                                                   |   (2) **THE TRUTH IN LENDING ACT,**
22 ACTIVEHOURS, INC. dba EARNIN                    |       **15 U.S.C. § 1601, *et seq.*;**
                                                   |   (3) **THE ILLINOIS PREDATORY**
23              Defendant.                         |       **LOAN PREVENTION ACT, 815**
                                                   |       **ICLS 123/15, *et seq.***
24
                                                   | <u>**CLASS ACTION**</u>
25
                                                   | <u>**DEMAND FOR JURY TRIAL**</u>
26

27

28

Plaintiffs Felix Ramirez, a Sergeant in the U.S. Marine Corps ("Sergeant Ramirez"), and Michael Collins, a Petty Officer First Class in the U.S. Navy ("PO Collins"), on behalf of themselves and all others similarly situated, and on behalf of the general public, allege the following based upon personal knowledge as to themselves and upon information and belief and the investigation of their counsel as to all other matters, and bring this Amended Class Action Complaint against ActiveHours, Inc. d.b.a. EarnIn ("EarnIn" or "Defendant") and allege as follows:

## NATURE OF THIS ACTION

1.      This Amended Complaint seeks to protect active-duty military service members and Illinois residents from EarnIn's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"), the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), and Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-5-5, *et seq.* ("PLPA").

2.      The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, EarnIn makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

3.      EarnIn is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay EarnIn principal and finance charges (including expedite fees and so-called "tips") on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as "0% interest" and promising "no mandatory fees," in practice, EarnIn takes in finance charges of on average **284%** on loans it issues. These annual percentage rates ("APR") can reach even greater heights, with several of its loans to Plaintiffs Ramirez *and* Collins exceeding **1,458%** APR. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependence on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

4. Plaintiffs are active military members who have used EarnIn's Cash Out product for years. By virtue of the sky-high fees charged for early access to his salary, EarnIn has extended consumer credit to Plaintiffs on numerous occasions in violation of the MLA, TILA, and PLPA.

5. Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's "Cash Out" transactions are in reality consumer credit.

6. EarnIn's Cash Out consumer credit agreements violate the MLA in at least five ways: By (1) charging interest above the 36% statutory military annual percentage rate ("MAPR") cap; (2) failing to provide any required MLA Disclosures; (3) including a Class Action Ban and Waiver of Jury Trial; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. §§ 987(b), (c) & (e)(1)(2)(5)(6).

7. And despite Illinois outlawing usurious payday loans, Defendant has offered its short-term, high-cost cash-advance product to Illinois consumers for years. In violation of Illinois law, Defendant has used this product to extract from Illinois consumers charges that yield APRs drastically exceeding the legal limit.

8. EarnIn systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

9. Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. Dᴇᴘ'ᴛ ᴏꜰ Dᴇꜰᴇɴsᴇ (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

10.    EarnIn's business practices violate the MLA, TILA, and PLPA and are part of a systematic nationwide policy and practice. Plaintiffs seek to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

### PARTIES

11.    Sergeant Ramirez is an individual, over 18 years of age. At all times relevant, Sergeant Ramirez was a natural person and citizen of Jacksonville, North Carolina. He has been a member of the United States Marine Corps since 2019. During the class period, Sergeant Ramirez was a Covered Member and an active-duty service member employed by the United States Marine Corps.

12.    PO Collins is an individual, over 18 years of age. At all times relevant, PO Collins was a natural person and citizen of Great Lakes, Illinois. He has been a member of the United States Navy since August 2015. During the class period, PO Collins was a Covered Member and an active-duty service member employed by the United States Navy.

13.    Defendant EarnIn is a Delaware corporation with its principal place of business in Santa Clara County, California. EarnIn has offered loan agreements to consumers, including Covered Members, since at least 2014, entering into millions of credit transactions.

### TOLLING OF THE STATUTE OF LIMITATIONS

14.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those

---

[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

1   similarly situated to Sergeant Ramirez, until their active-duty service concludes. Specifically, §

2   3936(a) of the SCRA provides:

3       The period of a servicemember's military service may not be included in computing
        any period limited by law, regulation, or order for the bringing of any action or
4       proceeding in a court, or in any board, bureau, commission, department, or other
        agency of a State (or political subdivision of a State) or the United States by or
5       against the servicemember or the servicemember's heirs, executors, administrators,
        or assigns.

6

7                               **JURISDICTION AND VENUE**

8       15.     This court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiffs'

9   Amended Complaint alleges two federal claims under the MLA and TILA. Under the MLA, "[a]n

10  action for civil liability . . . may be brought in any appropriate United States district court, without

11  regard to the amount in controversy, or in any other court of competent jurisdiction." 10 U.S.C. §

12  987. Under the TILA, "any action … may be brought in any United States district court, or in any

13  other court of competent jurisdiction." 15 U.S.C. § 1640(e).

14      16.     The Court has supplemental jurisdiction over the PLPA claim under 28 U.S.C. §

15  1367(a), because the PLPA claim is "so related to claims in the action within [the Court's]

16  original jurisdiction that they form part of the same case or controversy."

17      17.     In the alternative, this Court has jurisdiction over the PLPA claim pursuant to the

18  Class Action Fairness Act 28 U.S.C. § 1332(d), because: (a) this is a class action within the

19  meaning of Rule 23 of the Federal Rules of Civil Procedure; (b) the proposed Illinois Class

20  consists of at least 100 members; (c) at least one member of the proposed class is a citizen of a

21  state different from any defendant; and (d) the amount in controversy exceeds $5,000,000,

22  exclusive of interest and costs, aggregating the claims of all class members.

23      18.     Venue is proper in the County of Santa Clara because Defendant EarnIn is

24  headquartered in Santa Clara County, coordinated business operations in California, did business

25  in California and in Santa Clara County, and committed the wrongful acts alleged herein in Santa

26  Clara County.

27      19.     This Court has jurisdiction over EarnIn, because it, at all times relevant herein, was

28  headquartered in, qualified to do business and regularly conducted business in California.

20.     Furthermore, according to its terms of service, EarnIn submits itself to venue in this Court for any claims not subject to arbitration.

## LEGAL BACKGROUND

### The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

21.     The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

22.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

23.     Similarly, the "military culture emphasizes financial responsibility, with basic policy explicitly stating that Service members are to pay their just debts."[9]

24.     While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans,

---

[5] Report, *supra* n.1.
[6] *Id.* at 10–11.
[7] *Id.* at 11.
[8] *Id.* at 14. To be sure, EWA providers like EarnIn do not collect physical checks from their customers at loan initiation, but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.
[9] *Id.* at 10.

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

and 'military loans' via the Internet."[10] Those loans, like EarnIn's, "are delivered and collected online through electronic fund transfer."[11]

25.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate EarnIn's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[12]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[13]

---

[10] *Id.* at 15.

[11] *Id.* at 16.

[12] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.

[13] *Id.* at 21–22.

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

26.     The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[14]

27.     The Report also discussed the particular harms posed by small loans, noting short-term, small-dollar loan products "strip earnings or savings from the borrower; place the borrower's key assets at undue risk; do not help the borrower resolve their financial shortfall; trap the borrower in a cycle of debt; and leave the borrower in worse financial shape than when they initially contacted the lender."[15]

28.     As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[16]

29.     Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[17]

30.     To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[18]

31.     29.35.  The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming Service members. The legislation requested was supported by the DoD, military and

---

[14] *Id.* at 39.

[15] *Id.* at 3.

[16] *Id.* at 41–42.

[17] *Id.* at 46.

[18] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

32.    Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

### The Military Lending Act

33.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

34.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

35.    The MLA also requires mandatory disclosures in "consumer credit"[19] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);
- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and
- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

36.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Members to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

37.    The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

---

[19] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

38.     Additionally, the MLA prohibits lenders from using check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for an obligation.

### The Truth in Lending Act

39.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

40.     Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those EarnIn offers here. EarnIn fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *Id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *Id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *Id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *Id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *Id.* at § 1638(9);

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *Id.* at § 1638(11); and

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.* at § 1638(12).

**The Illinois Predatory Loan Prevention Act**

41.     Payday lending involves offering short-term loans, often for small amounts, with repayment expected on the borrower's next payday. These loans are frequently marketed as a quick solution for bridging financial gaps between paychecks.

42.     Before 2021, Illinois law permitted payday lenders to charge triple-digit annual percentage rates (APRs)—often 300% or more—on small-dollar, short-term loans.

43.     Myriad studies showed that the vast majority of payday lending in Illinois came from repeat borrowers. The high fee, short-term nature of payday loans was found to trap users in a cycle of debt, perpetuating the ever-growing need for addition borrowing and associated fees.

44.     Despite prior regulatory efforts, payday lending remained a significant source of economic harm and societal inequity for Illinois consumers, prompting legislative action to address these systemic issues. By the time the PLPA was enacted, the public and legislative consensus had grown that the payday lending model—high fees, short terms, repeat borrowing—was structurally predatory and disproportionately harmful to vulnerable people and communities.

45.     The Illinois Predatory Loan Prevention Act, signed into law in March 2021, represents a landmark reform aimed at eradicating predatory payday lending in the state.

46.     The PLPA establishes a clear 36% APR cap on all consumer loans, including payday, auto title, and installment loans.

47.     The PLPA is broad in scope and expressly prohibits evasion of its mandates. That

is, the PLPA states, "No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to" "disguis[ing]" loans as non-loan transactions.

48.     Additionally, the PLPA contains a provision that expressly forbids a waiver of "any provision" of the Act.

49.     The PLPA was expressly modeled after the Military Lending Act. Indeed, 815 ILCS 123/15-1-5 states the "purpose of th[e PLPA] is to protect consumers from predatory loans consistent with federal law and the Military Lending Act[.]"

50.     A press release from the governor's office noted: "While the existing federal law [*i.e.*, the MLA] already protects active-duty military with a 36 percent APR cap, this legislation would extend the same protection to Illinois veterans and all other consumers."[20]

51.     The same press release emphasized "Illinois families pay over $500 million per year in payday and title loan fees, which is the fourth highest in the nation," and the PLPA would serve the righteous purpose of "provid[ing] families with more economic stability."

52.     The PLPA applies to "loans," which it defines broadly to mean "money or credit provided to a consumer in exchange for the consumer's agreement to a certain set of terms, including, but not limited to, any finance charges, interest, or other conditions." 815 ILCS 123/15-1-10. The definition includes both closed-end and open-end credit agreements and "any transaction conducted via any medium whatsoever." *Id.*

53.     The PLPA delegated to the Illinois Department of Financial and Professional Regulation (the "DFPR") the authority to draft, adopt, and enforce administrative rules ensuring lenders comply with the act.

54.     When the PLPA was enacted, the DFPR issued a press release noting the "PLPA covers many types of consumer loans, which include . . . ***wage advance products***" like EarnIn's

---

[20] *Gov. Pritzker Signs Equity-Centric Legislation Expanding Economic Access and Opportunity Across Illinois*, Ill. Dep't of Fin. & Prof. Reg. (Mar. 23, 2021), https://idfpr.illinois.gov/content/dam/soi/en/web/idfpr/news/2021/2021-03-23-predatory-loan-prevention-and-cra.pdf.

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

1  Cash Out product.[21]

2      55.    A violation of the PLPA "constitutes a violation of the Consumer Fraud and

3  Deceptive Business Practices Act." 815 ILCS 123/15-10-5(b).

4  **FACTS**

5  **The Earned Wage Product Market and EarnIn**

6  **EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

7      56.    A significant driver of demand for consumer credit and financial products stems

8  from the mismatch between when a family receives income and when they pay expenses.

9  Employees generally provide services before being paid for their labor and are typically paid in

10 arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for

11 years turned to credit cards, personal installment loans, and payday loans.

12     57.    Recently, an old product with new packaging—coined "earned wage access" or

13 "earned wage advance" ("EWA")—has been created and offered to consumers to address the

14 same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA

15 products are garden variety cash advances.

16     58.    EWA products provide workers, before their payday, with a portion of their earned

17 but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages.

18 Loaned funds are repaid via automated withdrawal from the consumer's bank account.

19     59.    Defendant EarnIn is one such fintech company that provides an EWA service,

20 which it calls "Cash Out." The Cash Out service enables EarnIn customers to "access certain

21 forms of [their] income, such as [their] earned wages . . . , prior to when that income is deposited

22 into [their] eligible bank account by requesting an advance of that income from EarnIn[.]"

23     60.    To repay these loans, users must "link that bank account to your EarnIn profile

24 [and] authorize debits from your Bank Account or another eligible bank account."

25     61.    EWA providers advertise their products as "free" or "0% interest" while obscuring

26 the ways in which they bilk consumers for fees and other finance charges that add up to loan-

27 _____

28 [21] *See IDFPR Releases Consumer Frequently Asked Questions About the Predatory Loan Prevention Act*, Ill. Dep't Fin. & Prof. Reg'n (Apr. 30, 2021), attached hereto as Exhibit 1.

shark rates.

62.     EarnIn is generally paid through two types of fees: (1) expedite fees, and (2) so-called "tips."

63.     First, **expedite fees** (referred to by EarnIn as "Lightning Speed Fees") are charged to provide instant access to loan funds. For its "Cash Out" product, EarnIn charges $3.99 for instant access to loans of $100 or less and $5.99 for loans between $100 and $150.

64.      Before 2022, EarnIn did not charge users to obtain the advertised instant version of its product, and users could obtain advances immediately, and use them for their advertised and intended purpose without paying an additional charge.

65.     The actual cost to provide customers with instant access to funds is less than $0.05.[22]

66.     The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

67.     EarnIn's website includes numerous representations about the speed of access to funds, like:

- "Get money in your bank in minutes with Lightning Speed"
- "Make any day payday"
- "Now payday can be any day"
- "Get paid today"
- "Life doesn't happen biweekly—neither should payday"[23]

68.     While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of an advance usually takes 1–3 banking days for users

---

[22] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.
[23] EarnIn Website, app2.earnin.com (last visited Mar. 9, 2025).

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

to receive, while the expedited service takes just a few minutes. This delay is problematic for EarnIn's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

69.    Indeed, a recent study found that the average loan term for EWA Cash Out loans provided by EarnIn was only 8.8 days.[24] Consumers who cannot wait nine days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[25]

70.    Turning to the second type of fee, "**tips**" are simply additional funds the lender prompts the user to pay.

71.    These purported "tips" serve no purpose whatsoever to EarnIn customers and instead go directly to EarnIn's bottom line.

72.    EWA providers like EarnIn deploy techniques borrowed from behavioral economics to pressure users into tipping each time they obtain an EWA loan. For example, the California's Department of Financial Protection and Innovation ("DFPI") listed "multiple strategies that lenders use to make tips almost as certain as required fees," including "[s]etting default tips and using other user interface elements to mak[e] tipping hard to avoid; [m]aking it difficult to set a $0 tip or not advertising that a particular payment is optional; and [c]laiming that tips are used to help other vulnerable consumers or for charitable contributions."[26]

73.    EarnIn weaponizes each of these strategies against its customers to secure tips, and

---

[24] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").

[25] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

[26] *2021 Earned Wage Access Findings*, CAL. DEP'T FIN. PROTEC. & INNOVATION, at 61–62 (March 2023),        https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf (hereinafter "DFPI Findings")

1  to great effect. A recent data summary found EWA providers that request tips receive them in

2  73% of transactions, on average $4.09 in tips per transaction.[27] A few examples of tip screens

3  EarnIn shows its customers are given below:




74.    EarnIn has said in public testimony that 40% of its revenue comes from tips

alone.[28]

75.    When properly viewing EWA products' tips and expedite fees as costs of credit

(*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

76.    A recent study found the average APR imposed by EWA providers (that collect

tips and expedite fees) is 334%, in line with payday loans:

---

[27] *Id.*

[28] Vt. House Comm. on Com. and Econ. (2023, February 14), at 2:16:45, available at https://www.youtube.com/clip/Ugkx7fEU-NXc2ZqgurJSRZTHXm_rpCNHzVcU.

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND



**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

**Wage-based cash advances that don't request tips**
331%

**Wage-based cash advances that request tips**
334%

Payday loans
353%

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

77.     The APR received by EarnIn for its Cash Out product is similar and often *much higher*. In a study that analyzed a sample of thousands of EarnIn transactions between 2022 and 2023, the Center for Responsible Lending ("CRL") found the average EarnIn loan was for $83.00, cost the consumer $5.00 in fees, and had an 8.8 day duration yielding an astonishing **284%** APR.[29] As discussed *infra*, EarnIn routinely made loans to Plaintiffs that were even more expensive, with APRs as high as **1,458%**. *See infra*.

78.     Ironically, EarnIn and other industry participants market their products as a low-cost alternative to payday loans.[30] In truth, EarnIn is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loan products it claims to replace.

79.     On top of charging loan-shark interest rates, EarnIn limits the amount a borrower can access per day, while simultaneously allowing multiple advances per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips. To that end, EarnIn allows users to obtain loans for no more than "$150/day (with a max of $750 per pay period)[.]"[31] These limits have grown over time.

---

[29] *Not Free*, *supra* note 24, at 5–10.
[30]     *The EarnIn Origin Story*, YOUTUBE: EARNIN (July 26, 2024), https://www.youtube.com/watch?v=PqS-J5T_FDo (describing EarnIn instant cash EWA product as an alternative to "payday loans" and as helping consumers avoid "overdraft fees").
[31] EarnIn Website, https://www.earnin.com/products/cashout (last visited Mar. 9, 2025)

80.    This architecture maximizes fees for EarnIn, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[32]

81.    The end result is a product that traps consumers in a cycle of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees associated with—EWA loans.

82.    A CRL analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[33] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

83.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[34]

**EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

84.    While EWA products are financially disastrous for customers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting

---

[32] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").
[33] *Loan Shark*, *supra* note 32, at 7.
[34] *Not Free*, *supra* note 24, at 6.

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

1    underwriting procedures that ensure cash advances, and the fees that accompany them, are timely

2    repaid through automated bank account debits that borrowers authorize when taking out the loans.

3        85.    EarnIn has various criteria borrowers must meet to be eligible for a cash advance.

4    For instance, prospective borrowers must earn at least $320 each pay period to receive an EarnIn

5    Cash Out advance. EarnIn verifies its customers' consistent income by requiring that borrowers

6    link their financial accounts to the EarnIn app.

7        86.    To determine whether a borrower is creditworthy, and decide how much credit to

8    extend in the first place, EarnIn requires users to connect their accounts to Earnin through Plaid.

9    Plaid partners with EarnIn and other fintech companies to allow them to view data in customers'

10   accounts. Plaid allows EarnIn to "[q]uickly verify assets and income" of EarnIn users, providing

11   "real-time insights into a borrower's income and employment in seconds with a breakdown of

12   earnings from salaries, gig work, and more."[35]

13       87.    EarnIn uses its real-time insight into customer accounts to ensure borrowers will

14   have sufficient funds to repay their loans on payday and schedule debits for the payday

15   immediately following any given loan, ensuring their loans are paid as soon as funds become

16   available.

17       88.    In addition to tracking historical income direct deposits, EarnIn uses technology to

18   ensure workers remain employed—and are physically working in the locations they claim to

19   work—for periods where Cash Out loans are extended. EarnIn's app requires borrowers to verify

20   their company email address and/or share their location with EarnIn via GPS so that EarnIn can

21   be sure borrowers are working (and will therefore be able to repay Cash Out loans) when they say

22   they are.

23       89.    EarnIn represents that 85% of its active community members share their location

24   with EarnIn and encourages borrowers to share their location through the app to be better

25   qualified for Cash Out loans:

26

27

28   [35] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 11,
     2025).

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND



90.    EarnIn's founder, Ram Palaniappan, candidly explained how EarnIn leverages its extensive user data to ensure repayment of the money it lends:

> **[Podcast host]**: Okay. So then, how do people settle up, do you [EarnIn] verify that what they're saying is actually….do you go into the bank account to make sure like they're saying, hey, I earn $60,000 a year, but actually, they're earning really less than that. How do you verify that?
>
> **Ram [Palaniappan]**: Yeah. So, the bank account is one part, the other piece that we have **built into the app is very much like a time attendance system** and what that lets us do is **know how much somebody is worth everyday**. So, it's very similar to modern time and attendance system like TSheets from Intuit. We have some more technology, **we can basically construct what someone has earned since their last payday** as well, again, that can basically construct what we call the Earnings Account.
>
> . . .
>
> **[Podcast host]**: . . . [D]o you have…because you're taking on risk, right, like someone, you're taking on some risk because you don't know whether they could get fired from their job the next day and not be able to pay you back, I mean, do you have some stats on kind of how much or what the losses are that you've gone through over the course of your operation?
>
> **Ram**: Yeah. So, we do have some risk and some loss and one way to describe when someone loses their job, the risk truly is we did not correctly recognize that they lost

their job because **we're trying to figure out your earnings continuously during the day and if you stop working, we should be able to pick that up**. So, it's [*i.e.*, the risk of borrower default or non-payment] really very, very minimal . . . .[36]

91.    EarnIn's underwriting process is both detailed and ongoing. EarnIn continually adjusts maximum withdrawal amounts—both daily and per pay period—depending on the individual's borrowing history, financial health (as gleaned through Plaid), and time and attendance at work. In determining how much credit to extend, EarnIn considers "a variety of factors including [borrowers'] bank balance, spending behavior, repayment history, and income."[37]

92.    For borrowers who qualify, EarnIn monitors their financial health to determine how much credit to extend based on borrowers' need and ability to repay.[38] Through its constant underwriting process, EarnIn extends loans to borrowers only when it is confident they will repay.

93.    For qualifying borrowers, EarnIn generally begins by offering relatively low amounts of credit, between "$50 and $250 on average when signing up." Borrowers obtain greater access to credit—*i.e.*, EarnIn raises their maximum loan limit—by consistently paying off loans to EarnIn on time and generally improving their financial health (which EarnIn monitors through the borrowers' bank balance, spending behavior, repayment history, and income).[39]

94.    These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by

---

[36] Peter Renton, *Podcast 284: Ram Palaniappan of EarnIn*, FinTech One-On-One Podcast (Feb. 5, 2021) (Transcript of podcast), https://www.heyfuturenexus.com/podcast-284-ram-palaniappan-of-earnin/.

[37] *Cash Out FAQ: How much can I access per pay period?*, earnin.com, https://www.earnin.com/products/cashout#:~:text=Do%20I%20have%20to%20be,pay%20period%20to%20use%20EarnIn. (last visited Mar. 16, 2025).

[38] *Cash Out FAQ: How long does it take to see a higher pay period Max?*, earnin.com, https://www.earnin.com/products/cashout#:~:text=Do%20I%20have%20to%20be,pay%20period%20to%20use%20EarnIn. (last visited Mar. 16, 2025) ("Your pay period Max is evaluated each pay period.").

[39] *Id.* ("Most customers receive a Pay Period Max increase within their first two pay periods. Good financial habits, such as keeping a positive bank balance and managing spending, contribute to Pay Period Max increase. The Pay Period Max is capped at $750.").

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[40] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EarnIn directly reviews borrowers' financial accounts—is one without a difference.

95.    In addition to these loan qualification procedures, borrowers must link a debit card and checking account to their EarnIn profile to ensure seamless repayment.

96.    EarnIn represents on its website and in its app that cash advances must be repaid "when your paycheck hits" and that repayments are "due to EarnIn on payday."[41] Failure to pay back a Cash Out loan results in suspension of the borrower's EarnIn account.

97.    In sum, EarnIn's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they are employed and regularly paid through that employment; (2) be paid at least $320 per pay period through that employment (3) link the bank account to which paychecks are deposited to EarnIn's app through Plaid; (4) authorize EarnIn to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees and tips; and (5) be current on all prior EarnIn Cash Out loans. Borrowers who fail to complete these steps cannot obtain cash advances.

98.    Additionally, if a customer is unable to repay a loan, EarnIn prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

---

[40]  Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.
[41]  EarnIn further states in its terms of service: "To repay Cash Out Services, you must authorize debits from your Bank Account or another eligible bank account."

99.    What's more, EarnIn provides no mechanism for cancelling repayment debits through the app. Once a Cash Out loan has been taken, the app does not allow users an option to cancel the repayment debit or disconnect their bank account from which repayment is automatically scheduled to be drawn.

100.    Although EarnIn claims its Cash Out product is something other than consumer credit or lending because its terms of service say that its advances are "non-recourse," that provision—buried in EarnIn's terms of service—is functionally a dead letter.

101.    As noted above, EarnIn ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's employer deposits the borrower's next paycheck. And its app actively prevents users from cancelling repayments or disconnecting accounts from which repayments are drawn. Thus, it is no surprise that, as EarnIn's CEO explains, the risk of non-repayment is "really very, very minimal." *See supra* ¶ 90.

102.    These debt collection methods are so successful that EWA lenders like EarnIn recoup their advances at least 97% of the time using these tactics.[42]

### EarnIn's Loans to Plaintiffs

103.    Sergeant Ramirez is currently an active-duty Sergeant stationed at Camp Lejeune in North Carolina.

104.    PO Collins is an active-duty Petty Officer First Class in the U.S. Navy stationed at Naval Station Great Lakes.

105.    EarnIn extended consumer credit to Plaintiffs in the form of "Cash Out" transactions like those discussed above.

106.    Plaintiffs used the loans from EarnIn for personal, family, or household purposes.

107.    Plaintiffs paid EarnIn's finance charges, in the form of lightning speed fees and tips, to obtain cash-advance loans from EarnIn.

---

[42] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

108.    A small selection of "CashOut" loans made by EarnIn to Plaintiffs are shown in the below table, with the cost of credit and APR included:

**Sergeant Ramirez**

| Date | Principal Amt. | Tips / Lightning Fees / Total | Loan Period | APR |
|---|---|---|---|---|
| 4/3/22–4/12/22 | $50.00 | $5.00/$2.99/$7.99 | 9 days | 648% |
| 7/4/22–7/13/22 | $50.00 | $8.00/$2.99/$10.99 | 9 days | 891% |
| 1/28/24–1/30/24 | $100.00 | $4.00/$3.99/$7.99 | 2 days | 1,458% |
| 5/19/24–5/29/24 | $100.00 | $1.00/$3.99/$4.99 | 10 days | 182% |
| 1/29/25–2/12/25 | $150.00 | $1.00/$5.99/$6.99 | 14 days | 121% |

**PO Collins**

| Date | Principal Amt. | Tips / Lightning Fees / Total | Loan Period | APR |
|---|---|---|---|---|
| 1/30/25–2/12/25 | $50.00 | $4.00/$3.99/$7.99 | 13 days | 449% |
| 2/13/25–2/20/25 | $50.00 | $4.00/$3.99/$7.99 | 7 days | 833% |
| 2/24/25–2/26/25 | $150.00 | $6.00/$5.99/$11.99 | 2 days | 1,459% |
| 3/10/25–3/12/25 | $150.00 | $6.00/$5.99/$11.99 | 2 days | 1,459% |
| 3/23/25–3/28/25 | $50.00 | $4.00/$3.99/$7.99 | 5 days | 1,167% |

109.    Sergeant Ramirez has received dozens of usurious loans from EarnIn since he started using the service in 2021. In 2024 alone, Sergeant Ramirez took out **eighty-nine** loans, paying interest rates that dwarf the 36% MLA cap.

110.    The story is similar for PO Collins. From January to May 2025, PO Collins received more than twenty-five Cash Out loans from EarnIn.

111.    The "Lightning Speed" fees and tips are immediately and directly connected to EarnIn's extensions of credit to Plaintiffs.

112.    Further, EarnIn's credit agreement required Plaintiffs to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

113.    EarnIn's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

114.    Additionally, EarnIn used a check or other method of access to a deposit, savings, or other financial account maintained by Plaintiffs as security for the obligations in violation of 10 U.S.C. § 987(e)(5).

**<u>CLASS ACTION ALLEGATIONS</u>**

115.    Plaintiffs bring this class action on behalf of themselves and all other persons similarly situated and the general public. The proposed "MLA Class," "Illinois Class," and "TILA Class" (collectively the "Classes") are defined as follows:

**MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with EarnIn to use its "Cash Out" product, in which EarnIn was paid a finance charge (including, without limitation, a lightning speed fee or tip).

**Illinois Class**: All Illinois residents that entered into an agreement with EarnIn to use its "Cash Out" product, in which EarnIn was paid a finance charge (including, without limitation, a lightning speed fee or tip).

**TILA Class**: All Covered Members, dependents of Covered Members (under the MLA) and Illinois residents that entered into an agreement with EarnIn to use its "Cash Out" product, in which EarnIn was paid a finance charge (including, without limitation, a lightning speed fee or tip).

116.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) EarnIn and any entity in which EarnIn has a controlling interest, or which has a controlling interest in EarnIn, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

117.    Plaintiffs reserve the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

**Numerosity and Ascertainability**

118.    Plaintiffs are unable to state the precise number of members of the classes because such information is in the exclusive control of EarnIn. EarnIn's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable. EarnIn has made millions of loans, and Plaintiffs estimate there are, at least many thousands of consumers in the MLA Class, Illinois Class, and TILA Class. As a result, Plaintiffs believe the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of EarnIn.

119.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in EarnIn's possession, custody, or control.

**Commonality**

120.    There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that EarnIn has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a.    Whether Plaintiffs and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;

b.    Whether EarnIn is a "creditor" subject to the protections and limitations of the MLA;

c.    Whether EarnIn's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

d.    Whether EarnIn entered into standard form loan agreements with Covered Members;

e.    Whether EarnIn's loans exceed the MLA statutory rate cap of 36% MAPR;

f.    Whether EarnIn failed to provide required credit disclosures in violation of the

1    MLA;

2  g.  Whether EarnIn's standard form loan agreements contain a class action waiver

3     provision or jury trial waiver provision in violation of the MLA;

4  h.  Whether EarnIn's standard form loan agreements contain an arbitration clause in

5     violation of the MLA;

6  i.  Whether EarnIn failed to provide required credit disclosures in violation of TILA;

7  j.  Whether EarnIn used a method of access to a deposit, savings, or other financial

8     account maintained by the borrower class members as security for the Cash Out

9     loan obligations;

10  k.  Whether each month EarnIn charged interest to Plaintiffs and Class Members it

11     restarted the statute of limitations under the MLA;

12  l.  Whether each month that Plaintiffs and the Class Members paid money to EarnIn it

13     restarted the statute of limitations under the MLA;

14  m.  Whether EarnIn is a "lender" as that term is understood under the PLPA, 815 ILCS

15     123/15-1-10;

16  n.  Whether EarnIn issued "loans" as that term is understood under the PLPA, 815

17     ILCS 123/15-1-10;

18  o.  Whether EarnIn's loans to members of the Illinois Class exceed the 36% rate cap

19     set by 815 ILCS 123/15-5-5;

20  p.  Whether Class members are entitled to actual or statutory damages for the

21     aforementioned violations and, if so, in what amounts;

22  q.  Whether EarnIn is subject to punitive damages, and, if so, the proper measure of

23     such damages and remedies to which Plaintiffs and the MLA Class are entitled

24     under 10 U.S.C. § 987(f)(5); and

25  r.  Any declaratory and/or injunctive relief to which the Classes are entitled.

26                                **Typicality**

27    121.    The claims and defenses of Plaintiffs are typical of the claims and defenses of the

28  MLA Class because Plaintiffs are Covered Members and loan agreements with EarnIn are typical

of the type of personal, household, or family loans that EarnIn normally provides to Covered Members. Additionally, EarnIn uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of Plaintiffs are typical of the claims and defenses of the TILA Class and the Illinois Class. Plaintiffs suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about Plaintiffs' claims. Plaintiffs have no interests antagonistic to the interests of the other members of the Classes.

### **Adequate Representation**

122.    Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Plaintiffs have no conflict of interest that will interfere with maintenance of this class action.

123.    Plaintiffs and their counsel are committed to vigorously prosecuting the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

### **Predominance and Superiority**

124.     The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

    a.  The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

    b.  Adjudications with respect to individual members of the Classes could, as a

1        practical matter, be dispositive of any interest of other members not parties to such

2        adjudications, or substantially impair their ability to protect their interests; and

3        c.   The claims of the individual Class members are small in relation to the expenses of

4        individual litigation, making a class action the only procedural method of redress

5        in which Class members can, as a practical matter, recover.

6     125.   The proposed Classes fulfill the certification criteria of Federal Rule of Civil

7 Procedure 23.

8                   **<u>FIRST CAUSE OF ACTION</u>**

**<u>(Violations of the Military Lending Act, 10 U.S.C. § 987, *et seq*.)</u>**

9          **<u>(On Behalf of Plaintiffs and the MLA Class against Defendant EarnIn)</u>**

10    126.   Plaintiffs re-allege and incorporates by reference herein the allegations set forth in

11 the paragraphs 1–125 above.

12    127.   The MLA prohibits a creditor from obligating a "Covered Member" or dependent

13 of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

14    128.   A "Covered Member" in the statute is a "member of the armed forces who is on

15 active duty under a call or order that does not specify a period of 30 days or less."

16    129.   "The MAPR is the cost of the consumer credit expressed as an annual rate." 32

17 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the

18 consumer credit." 32 C.F.R. § 232.4.

19    130.   Plaintiffs and the MLA Class Members are "Covered Members," subject to the

20 protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the

21 time the consumer becomes obligated on a consumer credit transaction or establishes an account

22 for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered

23 Member (as defined in 32 C.F.R. §§ 232.3(g)(2), (g)(3)).

24    131.   Plaintiffs are considered "Covered Members" with respect to their EarnIn loan

25 agreements because Plaintiffs are active-duty service members who are obligated by law to repay

26 loans they took out for personal, family or household purposes.

27    132.   EarnIn is a "creditor" subject to the requirements and limitations imposed by the

28 MLA in that it engages in the business of extending consumer credit to Covered Member

1    protected by the MLA. 10 U.S.C. § 987(i)(5); see also 32 C.F.R. § 232.3(i).

2        133.    The underlying loan transactions at issue in this case constitute "consumer credit"

3    subject to the protections and limitations imposed by the MLA because they are "credit offered or

4    extended to a Covered Member primarily for personal, family, or household purposes," subject to

5    a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. §

6    232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

7        134.    EarnIn charged Plaintiffs and the MLA class well above the 36% interest rate cap

8    on their loans, in violation of the MLA.

9        135.    EarnIn fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and

10    32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

11        136.    EarnIn's standard form loan agreements include mandatory arbitration agreements

12    in violation of 10 U.S.C. § 987(e)(3).

13        137.    EarnIn's standard form loan agreements include class action waivers and jury trial

14    waivers in violation of 10 U.S.C. § 987(e)(2).

15        138.    EarnIn uses a check or other method of access to a deposit, savings, or other

16    financial account maintained by Plaintiffs as security for the obligations in violation of 10 U.S.C.

17    § 987(e)(5).

18        139.    As a result, EarnIn violates 10 U.S.C. § 987.

19        140.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class,

20    Plaintiffs seek an order from the Court awarding statutory damages in the amount of $500 per

21    violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. §

22    987(f)(5)(A).

23        141.    Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C.

24    § 987(f)(5)(B).

25        WHEREFORE, Plaintiffs pray for relief as set forth below.

26                        **SECOND CAUSE OF ACTION**
         **(Violations of the Truth In Lending Act, 15 U.S.C. § 1601,** *et seq.***)**
27       **(On Behalf of Plaintiffs and the TILA Class against Defendant EarnIn)**

28        142.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in

---
29

the paragraphs 1–125 above.

143.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. EarnIn's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

144.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

145.    EarnIn is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

146.    EarnIn has not provided such disclosures before consummation of the loan agreements.

147.    EarnIn failed to provide such disclosures to Plaintiffs and the TILA Class.

148.    As a result, EarnIn violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

149.    Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiffs seek an order from the Court awarding actual damages and statutory damages and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
**(Violations of the Illinois Predatory Loan Prevention Act)**
**(On Behalf of Plaintiff Collins and the Illinois Class against Defendant EarnIn)**

150.    Plaintiff Collins re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–125 above.

151.    Plaintiff Collins brings this claim individually and on behalf of the Illinois Class.

152.    EarnIn is a lender, meaning EarnIn offers or makes loans to Illinois residents.

153.     EarnIn issued loans to Plaintiff Collins and other Illinois residents. That is, EarnIn provided money or credit to Plaintiff and the Illinois Class in exchange for the consumers' agreement to a certain set of terms, including finance charges, interest, or other conditions.

154.     Plaintiff Collins and the Illinois Class are borrowers residing in Illinois who obtained cash-advance loans from EarnIn and paid interest and other charges in connection with those loans.

155.     EarnIn's expedite fees and tip charges constitute finance charges for purposes of calculating the applicable APR under the PLPA.

156.     EarnIn's loans to Plaintiff and the Illinois Class exceed the 36% rate cap set by the PLPA.

157.     The PLPA renders loans made in excess of the 36% APR cap null and void, and provides that the consumer is not obligated to repay any amounts paid or owed on such loans. 815 ILCS 123/15-5-10.

158.     Plaintiff Collins and members of the Illinois Class have paid unlawful fees and finance charges in connection with EarnIn's loans and are entitled to relief under the PLPA.

159.     EarnIn's violations of the PLPA "constitute[ ] violation[s] of the Consumer Fraud and Deceptive Business Practices Act" ("CFDBPA").

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, on behalf of the Classes, Plaintiffs pray for judgment against EarnIn as follows:

a.   That the Court determine that this action may be litigated as a class action and that Plaintiffs and their counsel be appointed class representatives and class counsel, respectively;

b.   That the Court enter judgment against EarnIn and in favor of Plaintiffs and the Classes on all counts;

c.   That the Court find and declare that Plaintiffs and MLA Class Members' standard form loan agreements violate the MLA;

CLASS ACTION AMENDED COMPLAINT AND JURY DEMAND

d. That the Court find and declare that EarnIn violated the MLA and award Sergeant Ramirez, PO Collins and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e. That the Court award Plaintiffs and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. That the Court find and declare that EarnIn violated TILA and award Plaintiffs and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

g. An order awarding the members of the Classes actual, statutory, and all other damages available by law, with pre- and post-judgment interest;

h. That the Court enjoin EarnIn from continuing to engage in predatory lending practices in violation of the MLA, TILA, PLPA, and CFDBPA;

i. That EarnIn be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that EarnIn be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

j. That the Court award interest as allowable by law;

k. That the Court award reasonable attorneys' fees as provided by applicable law, including under the MLA, TILA, PLPA, and CFDBPA;

l. That the Court award all costs of suit; and

m. That the Court award such other and further relief as the Court may deem just and proper.

Dated:  June 20, 2025                                Respectfully submitted,

                                                     JACOBSON PHILLIPS PLLC

                                                     _/s/Joshua R. Jacobson_____
                                                     Joshua R. Jacobson (*pro hac vice*)
                                                     *Attorneys for Plaintiffs FELIX RAMIREZ,*
                                                     *MICHAEL COLLINS, and the Proposed Classes*

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of each and every cause of action so triable.

Dated: June 20, 2025                          Respectfully submitted,

JACOBSON PHILLIPS PLLC


_/s/Joshua R. Jacobson_
Joshua R. Jacobson (*pro hac vice*)

*Attorneys for Plaintiffs FELIX RAMIREZ,*
*MICHAEL COLLINS, and the Proposed Classes*