COOLEY LLP
WILLIAM K. PAO (252637)
JONATHAN B. WAXMAN (294851)
Wells Fargo Center, South Tower
355 South Grand Avenue, Suite 900
Los Angeles, CA  90071
Telephone: (213) 561-3250
Facsimile: (213) 561-3244
wpao@cooley.com
jwaxman@cooley.com

BRETT DE JARNETTE (292919)
AMIE L. SIMMONS (336356)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400
bdejarnette@cooley.com
asimmons@cooley.com

*Attorneys for Defendant*
ACTIVEHOURS, INC. dba EARNIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| FELIX RAMIREZ and MICHAEL COLLINS, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>ACTIVEHOURS, INC. d/b/a EARNIN,<br><br>Defendant. | Case No. 5:25-cv-03625-PCP<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br>Date:          November 20, 2025<br>Time:          10:00 a.m.<br>Dept:          Courtroom 8, 4th Floor<br>Judge:        Hon. P. Casey Pitts<br><br>Trial Date: None set<br>Date Action Removed: April 24, 2025 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 2

II.   STATEMENT OF FACTS .................................................................................. 3

    A.    Workers Use EarnIn to Access Their own Wages, Manage Financial Stress, and Avoid Payday Loan Cycles of Debt ................................. 3

    B.    Cash Out Offers Two Transfer Speeds and a Tip Option ...................................... 5

    C.    Plaintiffs Are Frequent Cash Out Users Who Sometimes Choose Not to Tip or Use Lightning Speed ........................................ 7

    D.    Procedural Background and Litigation Landscape ............................................. 9

III.  LEGAL STANDARDS ....................................................................................... 10

IV.   ARGUMENT ...................................................................................................... 11

    A.    EarnIn's Cash Out Product Is Not an Extension of Credit Under TILA or the MLA, Nor a Loan Under the IPLPA ......................... 12

        1.    Plaintiffs Fail to Plead Any Repayment Obligation ................................. 12

        2.    The High Repayment Rate Shows that EarnIn Users Value Cash Outs, Not that Users Have an Obligation to Repay EarnIn ...................... 16

    B.    EarnIn's Cash Out Product Does Not Include Any Finance Charges ................... 18

        1.    Optional Tips Are Not Finance Charges ................................................... 19

        2.    Lightning Speed Fees are Voluntary Expedite Fees, not Finance Charges ......................................................... 21

V.    CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................ 10, 11

*Belizaire v. Ahold U.S.A., Inc.,*
    2019 WL 280367, at *3 (S.D.N.Y. Jan. 22, 2019), *aff'd,* 796 F. App'x 51 (2d Cir.
    2020) ......................................................................................................................... 20

*Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.,*
    727 F.3d 917 (9th Cir. 2013) .................................................................................... 11

*Brand Tarzana Surgical Inst. v. Aetna Life Ins. Co.,*
    No. CV 18-9434, 2019 WL 12381185 (C.D. Cal. May 13, 2019) ............................ 17

*Coto Settlement v. Eisenberg,*
    593 F.3d 1031 (9th Cir. 2010) .................................................................................. 18

*Eclectic Props. E., LLC v. Marcus & Millichap Co.,*
    751 F.3d 990 (9th Cir. 2014) ............................................................................. 10, 11

*Edwards v. Wells Fargo and Co.,*
    606 F.3d 555 (9th Cir. 2010) ............................................................................. 12, 14

*Est. of Bolles v. Comm'r of I.R.S.,*
    No. 22-70192, 2024 WL 1364177 (9th Cir. Apr. 1, 2024) ...................................... 15

*Foster v. EquityKey Real Est. Invs. L.P.,*
    No. 17-cv-00067-HRL, 2017 WL 1862527 (N.D. Cal. May 9, 2017) ..................... 15

*GeoVector Corp. v. Samsung Elecs. Co.,*
    234 F. Supp. 3d 1009 (N.D. Cal. 2017) .................................................................. 10

*Golubiewski v. Activehours, Inc.,*
    No. 3:22-CV-02078, 2024 WL 4204272 (M.D. Pa. Sept. 16, 2024) ................... 3, 10

*Gonzalez v. Planned Parenthood of L.A.,*
    759 F.3d 1112 (9th Cir. 2014) ............................................................................. 17, 18

*Gonzalez v. Specialized Loan Servicing, LLC,*
    691 F. Supp. 3d 1162 (C.D. Cal. 2023) ................................................................... 14

*Harmon v. Fifth Third Bancorp,*
    No. 1:18-cv-00402, 2020 WL 2512820 (S.D. Ohio May 15, 2020), *aff'd,* 858 F. App'x
    842 (6th Cir. 2021) .................................................................................................... 14

*Household Credit Servs., Inc. v. Pfennig,*
    541 U.S. 232 (2004) ................................................................................................. 22

*Lazy Y Ranch Ltd. v. Behrens,*
    546 F.3d 580 (9th Cir. 2008) .................................................................................... 11

COOLEY LLP
ATTORNEYS AT LAW
CHICAGO

ii

**NOTICE OF MOTION AND MOTION
TO DISMISS PLAINTIFFS' FAC
5:25-CV-03625-PCP**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Littlejohn v. Phoenix Title Loans LLC*,
  No. CV-18-04250-PHX-SMB, 2020 WL 2527017 (D. Ariz. May 15, 2020) ...................... 18

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ....................................................................................... 23

*In re Marriage of Caminiti*,
  2019 IL App (1st) 171563-U ............................................................................ 15

*No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .......................................................................... 17

*O'Brien v. J.I. Kislak Mortg. Corp.*,
  934 F. Supp. 1348 (S.D. Fla. 1996) ................................................................ 19

*Orubo v. Activehours, Inc.*,
  No. 5:24-cv-04702-PCP, 2025 WL 1257695 (N.D. Cal. Apr. 30, 2025) ..................... *passim*

*Osorio v. Tile Shop, LLC*,
  No. 15-C-15, 2018 WL 1453552 (N.D. Ill. Mar. 23, 2018), *aff'd on other grounds sub nom.*, 939 F.3d 847 (7th Cir. 2019) ..................................................................... 13, 15

*Railey v. Pentagon Fed. Credit Union*,
  No. EDCV 22-2166 JGB (SPx), 2024 WL 3059343 (C.D. Cal. May 9, 2024) ..................... 18

*Reaper v. ACE Am. Ins. Co.*,
  No. 23-15178, 2024 WL 810697 (9th Cir. Feb. 27, 2024) ..................................... 11

*Reed v. Val-Chris Invs., Inc.*,
  No. 11-cv-371 BEN (WMC), 2011 WL 6028001 (S.D. Cal. Dec. 5, 2011) ..................... 13

*Slowjewski v. Polam Fed. Credit Union*,
  No. C-09-3011 JCS, 2010 WL 4973757 (N.D. Cal. Dec. 1, 2010), *aff'd sub nom.*
  *Slojewski v. Polam Fed. Credit Union*, 473 F. App'x 534 (9th Cir. 2012) ..................... 20, 22

*In re Smith*,
  No. AP 24 A 00243, 2025 WL 1794127 (Bankr. N.D. Ill. June 26, 2025)........................... 13

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001)........................................................................... 11

*Veale v. Citibank, F.S.B.*,
  85 F.3d 577 (11th Cir. 1996)........................................................................ 10, 21, 22

*Vogel v. Onyx Acceptance Corp.*,
  267 P.3d 1057 (Wyo. 2011) ............................................................................ 22

*Warren v. Fox Fam. Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003)........................................................................... 11

*Wyman v. First Am. Title Ins. Co.*,
  No. C 16-07079 WHA, 2017 WL 1508864 (N.D. Cal. Apr. 27, 2017)................................. 17

COOLEY LLP
ATTORNEYS AT LAW
CHICAGO

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Statutes**

815 ILCS
123/15-1-5 .................................................................................................................. 13
123/15-1-10 ........................................................................................................... 12, 13
123/15-5-5 .................................................................................................................. 11

10 U.S.C. § 987(e)(5) ........................................................................................................ 18

15 U.S.C.
§ 1602(f) .................................................................................................................... 12
§ 1602(g) ............................................................................................................... 11, 18
§ 1605(a) .................................................................................................................... 19

Ind. Code § 24-4.5-2-202 (2024) ..................................................................................... 23

**Other Authorities**

12 C.F.R.
pt. 1026, Supp. I, Part 1 ¶¶ 6(a)(2)-2(ix)–(x) (2024) ............................................. 22
§ 226.10(e) ................................................................................................................ 23
§ 1026.2(a)(17)(i) ...................................................................................................... 12
§ 1026.2(a)(13) .......................................................................................................... 15
§ 1026.2(a)(25) .......................................................................................................... 18
§ 1026.4(a) ................................................................................................................ 19
§ 1026.4(d)(1)–(3) ..................................................................................................... 21
§ 1026.17(b) .............................................................................................................. 15

29 C.F.R. § 531.52(a) ....................................................................................................... 20

32 C.F.R.
§ 232.2(a)(1) .............................................................................................................. 12
§ 232.3(f)(1) .............................................................................................................. 11
§ 232.3(g)(1) .............................................................................................................. 12
§ 232.3(h) ................................................................................................................... 12
§ 232.3(n) ................................................................................................................... 19
§ 232.3(s) ................................................................................................................... 18
§ 232.4(c) ................................................................................................................... 23
§ 232.13(a) ................................................................................................................. 15

67 Fed. Reg.
72618 ......................................................................................................................... 22
72619 ......................................................................................................................... 22

68 Fed. Reg.
16185 ......................................................................................................................... 22
16186-87 .................................................................................................................... 22
16187 ......................................................................................................................... 22

75 Fed. Reg.
58539 ......................................................................................................................... 22
58627 ......................................................................................................................... 22

COOLEY LLP
ATTORNEYS AT LAW
CHICAGO

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

82 Fed. Reg.
  54472 ................................................................................................ 19, 21, 23
  54547 ...................................................................................................... 19, 21
  54547 ............................................................................................................ 23

Fed. R. Civ. P.
  12(b)(1) .......................................................................................................... 1
  12(b)(6) .................................................................................................... 1, 10

Ill. Admin. Code
  tit. 38, § 215.10 ............................................................................................ 19
  tit. 38, § 215.20(b) ...................................................................................... 19

COOLEY LLP
ATTORNEYS AT LAW
CHICAGO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

**PLEASE TAKE NOTICE** that on November 20, 2025, before the Honorable P. Casey Pitts, Defendant Activehours, Inc. d/b/a EarnIn ("EarnIn," "the Company," or "Defendant") will move to dismiss with prejudice the Amended Complaint for Damages and Equitable Relief filed in the above-referenced matter (the "Amended Complaint" or "FAC") (ECF No. 26).  This Motion is made under Federal Rule of Civil Procedure 12(b)(1) and (6).  This Motion is based on the pleadings, the Memorandum of Points and Authorities, and the Request for Judicial Notice and Incorporation by Reference in Support of Defendant's Motion to Dismiss ("RJN") filed concurrently herewith, the Declaration of Brett De Jarnette ("De Jarnette Decl.") and exhibits thereto filed concurrently herewith, all pleadings and papers on file in this matter, and any other matters which may be submitted to this Court at the hearing or otherwise.

**STATEMENT OF RELIEF SOUGHT**

Defendant seeks an order under Rule 12(b)(1) and (6), dismissing with prejudice Plaintiffs' TILA claim for lack of subject matter jurisdiction, and the Amended Complaint and each of its causes of action for failure to state a claim upon which relief can be granted.

**STATEMENT OF THE ISSUES**

1.    Whether Plaintiffs fail to adequately plead that Defendant's Cash Out product constitutes an extension of credit under the Military Lending Act and Truth in Lending Act, or a loan under the Illinois Predatory Loan Prevention Act.

2.    Whether Plaintiffs fail to adequately plead that Defendant's Cash Out product imposes "Finance Charges" under the Military Lending Act, Truth in Lending Act, and Illinois Predatory Loan Prevention Act.

3.    Whether Plaintiffs fail to adequately plead that they suffered an injury in fact sufficient to confer Article III standing to bring their Truth in Lending Act claim.

COOLEY LLP
ATTORNEYS AT LAW
CHICAGO

1

NOTICE OF MOTION AND MOTION
TO DISMISS PLAINTIFFS' FAC
5:25-CV-03625-PCP

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Confronted with the substantive flaws outlined in EarnIn's June 12 Motion to Dismiss, Plaintiff Felix Ramirez—now joined by Plaintiff Michael Collins—filed an Amended Complaint in an attempt to salvage claims that were legally deficient from the outset. But the revised complaint fares no better than the first. In fact, it suffers from the same basic misunderstanding that plagued the original: a mischaracterization of what EarnIn's Cash Out product is—and, more importantly, what it is not.

EarnIn's Cash Out product is not a loan. There is no extension of credit, imposition of mandatory fees, or a legal obligation to repay. As a result, Cash Out present users with a no-risk, non-recourse option to access the wages they have already earned, which has been shown to help users *avoid* falling into debt.

Plaintiffs' misunderstanding extends beyond the nature of the product—it reaches into the legal framework itself. Their claims rely on the assertion that Cash Outs are loans. The Military Lending Act (MLA), the Truth in Lending Act (TILA), and the Illinois Predatory Loan Prevention Act (IPLPA) all apply only when there's an extension of credit—when a consumer undertakes a binding obligation to repay and incurs a finance charge, such as interest. EarnIn's Cash Out product has none of those elements. There is no repayment obligation. No collections. No reporting to credit bureaus. No mandatory fees or interest. If a user chooses not to repay, EarnIn simply refrains from offering future Cash Outs to that person. That's it—no late fees, no interest, no reinstatement fees, no impact to the user's credit score, and no penalty of any kind.

Plaintiffs' own transaction histories reinforce that the statutory lending laws in Plaintiffs' Amended Complaint do not apply to EarnIn's Cash Out product: Plaintiffs used the product voluntarily, without an obligation to repay, and with no mandatory fees. Ramirez accessed more than 200 Cash Outs, including many after this lawsuit was filed. Sometimes he paid an optional Lightning Speed fee to receive his funds faster; sometimes he didn't. Sometimes he tipped; sometimes he didn't. Collins followed a similar pattern, accessing over 50 Cash Outs, some after the Amended Complaint was filed. Like Ramirez, he tipped when he chose to—but never had an

obligation to do so. At no point did Plaintiffs' choices affect their ability to Cash Out or obligate them to repay. Put simply, Plaintiffs' usage confirms the fundamental nature of Cash Outs: under the plain language of the MLA and TILA, they are not "credit transactions"; under the IPLPA, they are not "loans." And there is no finance charge. EarnIn simply offers no-interest, optional access to already earned wages—something that millions of workers appreciate and rely on.

Plaintiffs may try to sidestep the voluntary nature of tips and Lightning Speed fees by pointing to *Orubo v. Activehours, Inc.*, No. 5:24-cv-04702-PCP, 2025 WL 1257695 (N.D. Cal. Apr. 30, 2025), where a motion to dismiss was denied. But that ruling came without the benefit of transaction records—records that, as here, show that Lightning Speed fees and tips are optional. In contrast, another federal court has already ruled the opposite way, holding that "optional tips and [Lightning Speed] fees are not finance charges under TILA." *Golubiewski v. Activehours, Inc.*, No. 3:22-CV-02078, 2024 WL 4204272, at *6 (M.D. Pa. Sept. 16, 2024).

At bottom, Plaintiffs—or perhaps their counsel—seek to recast a voluntary, worker-friendly earned-wage-access tool as a regulated consumer loan. But that narrative doesn't hold up. Not under the MLA, not under TILA, not under the IPLPA—and not under the facts as pleaded. The Amended Complaint should be dismissed, this time with prejudice.

## II.    STATEMENT OF FACTS

### A.    Workers Use EarnIn to Access Their own Wages, Manage Financial Stress, and Avoid Payday Loan Cycles of Debt

EarnIn's CEO, Ram Palaniappan, founded the Company in 2013, believing that workers should be able to access their pay as they earn it—not weeks later.[1] Delivering on that belief, EarnIn's flagship product, Cash Out,[2] allows users to access up to $750 of their earned but unpaid wages prior to their scheduled payday.[3] FAC ¶ 58. Users link their bank account to EarnIn and authorize repayment of the advance once their paycheck arrives. *See* Ex. 1[4], The Cash Out Services

---

[1]  *See Founder's Story*, EARNIN, https://www.earnin.com/press#:~:text=Founder's%20story,Ram%20Palaniappan (last visited July 24, 2025).
[2]  "Cash Out" is the only product at issue in this action.
[3]  *See The Complete Guide to Cash Advances*, EARNIN, https://www.earnin.com/blog/the-complete-guide-to-cash-advances (last visited July 24, 2025).
[4]  All citations to "Exhibit" or "Ex." refer to the exhibits attached to the De Jarnette Decl. filed concurrently herewith.

§ 7. They can revoke this repayment authorization and therefore stop repayment at any time, including by contacting customer support. *See* Ex. 8; De Jarnette Decl. ¶ 11. Users can also avoid repayment in other ways, including by de-linking their accounts or closing them entirely at their discretion, or by submitting a stop payment order with their bank.

Cash Out, along with other earned wage access ("EWA") products, plays a critical role in helping workers navigate the financial gaps that often arise between paychecks. These tools offer more than just convenience—they promote financial stability and well-being. One national survey found that 93% of users said EWA gave them greater control over their finances, 91% understood how it worked, and 82% experienced less financial stress. *See* Ex. 2 at 4. Notably, 77% reported improvements in their mental health. *Id.*

For EarnIn users, the benefits are quantifiable. Without access to Cash Out, users would, on average, face four more overdrafts per month and rack up roughly $55 in additional monthly late fees on bills. *See* Ex. 10. The product has also been associated with a roughly 8% *increase* in user income over a six-month period, in part because many users can now afford gas more consistently, making it easier to get to their jobs. *Id.* Military families, in particular, may find EWA products especially valuable. These tools align with the distinct financial challenges they face—frequent relocations, deployments, and unpredictable spousal employment, among others. EarnIn's platform is widely used, with more than 19 million downloads.[5]

What separates Cash Out from traditional "payday loans" or wage advances is its structure. It doesn't offer borrowed funds. It gives users early access to wages they've already earned. And crucially, users carry no legal obligation to repay. If a user chooses not to repay, nothing accrues— no interest, no collection efforts, no credit bureau reporting. *See* Ex. 2 at 3; Ex. 3 at 4–5. EarnIn's own user agreement underscores this point: users "***do not have an obligation to repay any of the Cash Out Services, and EarnIn will have no legal or contractual claim or remedy against [them] based on [a] failure to repay[.]***" *See* Ex. 1, The Cash Out Services § 7 (emphasis added).

Whereas payday loans encourage borrowers to "roll over" principal amounts, extending the loan's due date and incurring repeat fees in the process, EarnIn's Cash Out product does not involve

---

[5] EARNIN, https://www.earnin.com/ (last visited July 24, 2025).

rollovers and actually prevents users from continuing to use the product if they cannot repay. *See id.*; Ex. 4. For example, with payday loans, a user could borrow $300 for a $45 charge, to be paid back in 14 days. Ex. 4. He or she may "rollover" the $300 principal and pay $45 charges every 14 days. *Id.* This "roll over" cycle is similar to maxing out credit cards with high interest rates, creating a cycle of debt and forcing workers to take out more loans. *See id.* But the very structure of Cash Outs and other EWA products prevents these debt cycles by restricting a user's ability to receive any additional advances from EarnIn—while charging $0 in fees or interest—if a repayment date is extended beyond the user's scheduled payday.

### B.    Cash Out Offers Two Transfer Speeds and a Tip Option

EarnIn users choose from two transfer speeds to receive portions of their earned but unpaid wages through Cash Outs: (1) standard—which delivers funds in 1–2 business days at no cost or (2) Lightning Speed—which delivers funds within minutes for a nominal, fixed fee. *See* Ex 1, The Cash Out Services § 2. Lightning Speed is a convenience fee—similar to paying for expedited shipment of credit cards, making instant transfers on peer-to-peer payment services or digital wallets like CashApp, PayPal, or Venmo, paying an out-of-network ATM fee for an ATM that is closer than a free in-network ATM, paying for express delivery through food delivery apps, or purchasing a pass to skip the line at an amusement park. *See The Complete Guide to Cash Advances*, *supra* note 3; Ex. 2 at 7.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18    A user's decision to opt for Lightning Speed and pay a fee for expedited delivery is entirely

19 separate from the user's ability to receive a Cash Out in the amount they request. *See* Ex. 1, The

20 Cash Out Services § 2. The fee is not a condition of receiving a Cash Out, nor does it impact the

21 amount advanced. It is paid solely to access a faster disbursement method—nothing more.

22    Cash Out users may also ***choose*** to tip for appreciation, similar to tip screens at coffee shops,

23 restaurants, and in many other apps and corporate settings. *See id.*, The Cash Out Services § 6. For

24 example, organizations ranging from the travel sector (Hopper) to fundraising (GoFundMe and

25 ActBlue) give their users the option to leave tips for the organizations, similar to EarnIn. As in

26 other contexts where tips are optional, under the operative agreement, EarnIn clearly states that

27 "**Payment of a tip is completely optional**" (bold in original), whether a user "tips" has no effect

28 on the quality or availability of services, the size of any Cash Out a user will receive, or whether a

user will be eligible to receive a Cash Out. *See id.*; FAC ¶ 73. EarnIn will even refund user tips upon request after a Cash Out is debited, with no consequence to a user's ability to obtain further Cash Outs. *See* Ex. 1, The Cash Out Services § 6.

Users understand that tipping is optional, as 43% of Cash Out advances in June 2022 through December 2022 did not include a tip. *Reimagining the Way Money Moves*, EARNIN, https://www.earnin.com/impact (last visited June 3, 2025). As EarnIn's CEO explained about tips, "What we're doing is we're letting our members choose to pay whatever they think is fair, that actually builds trust. And so, it's a very different type of product when you actually put the customer in charge instead of dictating to the customer what happens." Ex. 10.

### C.    Plaintiffs Are Frequent Cash Out Users Who Sometimes Choose Not to Tip or Use Lightning Speed

***Plaintiff Ramirez.***  Since joining EarnIn in 2021, Ramirez has received 244 total Cash Outs—including 41 after filing this lawsuit. *See* Ex. 6. He used 14 different tip amounts, with approximately one-third of tips at $1.00 or less, and in 34 separate transactions he refrained from tipping altogether. *See id.* In 2025 alone, Ramirez received 52 Cash Outs and did not provide a tip in approximately 65% of those transactions. *See id.* Over the course of his tenure as an EarnIn user, Ramirez received a total of $23,450 in advances through Cash Out, while choosing to pay less than $900 in tips and roughly $800 in Lightning Speed fees (just 3.7% and 3.4% of the total advanced amount, respectively). *See id.*



COOLEY LLP
ATTORNEYS AT LAW

Ramirez also understood that Lightning Speed was optional, because he chose the standard, no cost, transfer at least 42 times. *See id.* For example, in March and April 2024, Ramirez received 15 consecutive Cash Outs without paying a Lightning Speed fee. *See id.* Through these transactions, EarnIn provided Ramirez with access to a steady stream of his earned wages without charging—much less collecting—*any* mandatory fees. *See id.*

Ramirez also understood that he had no obligation to repay because, on 10 different occasions, he, in fact, did not repay on his scheduled payday. *See id.*; De Jarnette Decl. ¶ 9. Instead of walking away with a gain but losing future access to Cash Outs, Ramirez voluntarily repaid on subsequent dates and EarnIn restored his access. *See* Ex. 6.

***Plaintiff Collins.*** Since joining EarnIn in 2024, Collins has used Cash Out 56 times—including 9 transactions after filing the Amended Complaint. *See* Ex. 7. Across those transactions, Collins selected six different tip amounts and tipped $1.00 or less in about 30% of them. *See id.* Collins understood from the start that tipping was optional; in fact, he left a zero tip for just his second Cash Out transaction. *See id.*

Altogether, Collins received $5,772 in advances through Cash Out. He voluntarily paid $194 in tips and $273.45 in Lightning Speed fees (just 3.3% and 4.7% of the total advanced, respectively). *See id.*



Cooley LLP
Attorneys at Law

### D.    Procedural Background and Litigation Landscape

Ramirez originally filed suit in Santa Clara County Superior Court, asserting claims under the Military Lending Act (MLA) and the Truth in Lending Act (TILA), on behalf of putative classes and the general public. *See* ECF No. 1-3 ¶ 93. EarnIn timely removed the case to this Court on April 24, 2025. *See* ECF No. 1. On June 12, 2025, EarnIn moved to dismiss Ramirez's Complaint. ECF No. 21.

Rather than oppose that motion, Plaintiffs filed an Amended Complaint on June 20, 2025. The new pleading adds Michael Collins as a named plaintiff—a purported Illinois resident who asserts the same claims as Ramirez, along with an additional claim under the Illinois Predatory Loan Prevention Act (IPLPA) on behalf of a proposed Illinois Class. *See* FAC ¶¶ 12, 115, 150–59.

The Amended Complaint also introduces new allegations, including: (i) that EarnIn conducts "underwriting," based largely on selective excerpts from a 2021 podcast interview with EarnIn's CEO; (ii) that users supposedly cannot cancel repayment debits via the app—an allegation flatly contradicted by the app's actual functionality, as explained in EarnIn's online help center; and (iii) that EarnIn has "access" to user accounts, allegedly as a form of "security" for "obligations." *See* FAC ¶¶ 88–90, 99, 101, 138.

But none of these additions—including the IPLPA claim—cure the defects in Plaintiffs' case. First, Cash Outs are not loans or extensions of credit. There is no obligation to repay, and users can revoke debit authorizations, de-link their accounts or close them entirely at their discretion, or submit a stop payment order with their bank. Second, optional tips and Lightning Speed fees are not "finance charges" under any relevant statute, because they are not imposed by EarnIn as a condition of receiving a Cash Out.

This lawsuit is one of numerous misguided class actions challenging EWA products under state and federal lending laws. EWA providers across the industry—including EarnIn—have been the targets of a growing wave of litigation, with plaintiffs alleging that these non-recourse EWA products are, in fact, credit products subject to laws such as TILA and various state payday lending statutes. At plaintiffs' behest, courts are being asked to step into the role of policymakers and

1  legislators and fit the "square peg" of these novel financial tools into the "round holes" of state and

2  federal lending laws.

3        Two prior cases addressed whether EarnIn's Cash Out product (1) constitutes credit, and

4  (2) includes finance charges under TILA.  In *Golubiewski v. Activehours, Inc.*, the Middle District

5  of Pennsylvania dismissed a TILA claim (among other consumer protection and lending law claims

6  the court also dismissed), holding that EarnIn's "optional tips and fees are not finance charges under

7  TILA, which requires that the fees be a necessary condition for credit."  2024 WL 4204272, at *6.

8        This Court reached a different conclusion in *Orubo v. Activehours, Inc.*, 2025 WL 1257695.

9  However, the Court did so without having had the benefit of (1) plaintiffs' full transaction records,

10  which show Lightning Speed fees and tips are optional (plaintiffs cited some of their transaction

11  records in the complaint but selectively excluded a majority of their Cash Out transactions);

12  (2) briefing on Georgia Senate Bill 282 (Feb. 2025);[6] (3) briefing on the Georgia Attorney

13  General's 2024 unofficial opinion (U2024-1) that instant access fees charged by EWA providers

14  are not interest;[7] or (4) discussion of the Eleventh Circuit's decision in *Veale v. Citibank, F.S.B.*,

15  which held that avoidable mailing fees to expedite a refinancing were not finance charges because

16  they were not incident to the extension of credit. *See* 85 F.3d 577, 579 (11th Cir. 1996).[8]

17  **III.    LEGAL STANDARDS**

18        "Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

19  if it fails to state a claim upon which relief can be granted." *GeoVector Corp. v. Samsung Elecs.*

20  *Co.*, 234 F. Supp. 3d 1009, 1013 (N.D. Cal. 2017). To survive a Rule 12(b)(6) motion to dismiss,

21  a plaintiff must plead "facts that 'allow the court to draw the reasonable inference that the defendant

22  is liable for the misconduct alleged,'" and there "must be 'more than a sheer possibility that a

23  defendant has acted unlawfully.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see*

24

25  [6] This Bill would be unnecessary if the Georgia Payday Lending Act already applied to EWA products.
   [7] EarnIn's prior counsel in *Orubo* submitted the Georgia Attorney General's unofficial opinion to

26  the Court *after* the Motion to Dismiss hearing, and one week before the Court's order on the Motion
   to Dismiss.  *See Orubo*, ECF No. 39.  But there was no briefing in *Orubo* on the Georgia AG's

27  unofficial opinion.
   [8] EarnIn filed a motion for judgment on the pleadings in *Orubo* to address these issues on

28  July 25, 2025.

*also Eclectic Props. E., LLC v. Marcus & Millichap C*o., 751 F.3d 990, 996–97 (9th Cir. 2014) (explaining that "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability," plaintiffs must offer "facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible" (alteration in original) (citation omitted).

On a motion to dismiss, the court accepts as true all well-pled factual allegations and draws all reasonable inferences in the plaintiff's favor but need not accept conclusory statements, unwarranted deductions, unreasonable inferences, or allegations that "contradict[] documents that are referenced in the complaint or that are properly subject to judicial notice." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Iqbal*, 556 U.S. at 678. Nor does it "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citation omitted). While plaintiffs are permitted to plead facts "on information and belief," "naked assertions devoid of further factual enhancement" will not allow a complaint to survive a motion to dismiss. *Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 926–27 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678); *see also Reaper v. ACE Am. Ins. Co.*, No. 23-15178, 2024 WL 810697, at *1 (9th Cir. Feb. 27, 2024) (holding that "[t]he district court properly disregarded most of the allegations made on information and belief because they were conclusory"). Further, the allegations must give fair notice to enable the opposing party to defend itself effectively. *Eclectic Props.*, 751 F.3d at 995–96.

## IV.    ARGUMENT

To survive a motion to dismiss on the TILA and MLA claims, Plaintiffs must adequately plead facts demonstrating that the Cash Out transactions constitute "credit," ***and*** that this "credit" is subject to a "finance charge." *See* 32 C.F.R. § 232.3(f)(1) (defining "consumer credit" under the MLA); 15 U.S.C. § 1602(g) (defining "creditor" under TILA, in relevant part). The IPLPA imposes a similar obligation—Plaintiff Collins must adequately plead that Cash Outs are "loans" subject to "finance charges" that exceed the 36% interest rate cap. 815 ILCS 123/15-5-5. Because Plaintiffs

have failed to adequately allege that (i) EarnIn's Cash Out product is an extension of "credit" or a "loan," or (ii) that the "credit" or "loan" is subject to a "finance charge," the Amended Complaint must be dismissed as a matter of law.

### A.      EarnIn's Cash Out Product Is Not an Extension of Credit Under TILA or the MLA, Nor a Loan Under the IPLPA

As a threshold matter, neither TILA, the MLA, nor the IPLPA applies to EarnIn's Cash Out product, because Cash Outs are not an extension of "credit" or a "loan." TILA and its implementing rule, Regulation Z, impose disclosure obligations only on "creditor[s]," defined as persons who "regularly extend[] consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments." 12 C.F.R. § 1026.2(a)(17)(i). Under TILA, "credit" means "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The MLA mirrors this framework. It protects "covered borrower[s]," defined as consumers who "become[] obligated on a consumer credit transaction." 32 C.F.R. §§ 232.2(a)(1), 232.3(g)(1). The MLA likewise defines "credit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). Thus, as with TILA, the MLA does not apply in the absence of a debt.[9] Similarly, the IPLPA governs "lenders"; i.e., "any person or entity . . . that offers or makes a loan." 815 ILCS 123/15-1-10. The IPLPA defines "loan" as "money or credit provided to a consumer in exchange for the consumer's agreement to a certain set of terms, including, but not limited to, any finance charges, interest, or other conditions." *Id.* Because EarnIn's Cash Out product does not constitute an extension of "credit" or "loan" as a matter of law, the TILA, MLA, and IPLPA claims must be dismissed.

### 1.      Plaintiffs Fail to Plead Any Repayment Obligation

Under federal law, the mere likelihood or expectation of repayment following an advance of funds—as Plaintiffs allege (FAC ¶¶ 84–102)—is insufficient to establish the existence of

---

[9] "Debt" is a "[l]iability on a claim; a specific sum of money due by agreement or otherwise." *Debt,* BLACK'S LAW DICTIONARY (12th ed. 2024); *see Edwards v. Wells Fargo and Co.*, 606 F.3d 555, 557, 557 n.11 (9th Cir. 2010) (defining "obligor" for purposes of TILA with definition from Black's Law Dictionary).

"credit" under either TILA or the MLA.[10] *See, e.g.*, *Reed v. Val-Chris Invs., Inc.*, No. 11-cv-371 BEN (WMC), 2011 WL 6028001, at *2 (S.D. Cal. Dec. 5, 2011) (holding that a cash advance on the plaintiff's inheritance was not a "credit transaction" subject to TILA because the "[p]laintiff incurred no debt and [the defendant] had no recourse against [the] [p]laintiff if his potential inheritance was not sufficient to cover [the advance]").

The same principle governs whether a transaction is a "loan" under the IPLPA.[11] To constitute a "loan," the lender must provide credit to a consumer "in exchange for the consumer's agreement to a certain set of terms, including . . . finance charges, interest, or other conditions." 815 ILCS 123/15-1-10. Further, the IPLPA provides enumerated examples of transactions that fall within the definition of "loan"—predominantly installment transactions, none of which resemble EarnIn's Cash Out product. *See id.* ("'Loan' includes closed-end and open-end credit, retail installment sales contracts, [and] motor vehicle retail installment sales contracts[.]").[12]

---

[10] The Court's ruling in *Orubo* is not controlling here. There, the Court relied primarily on Georgia state law, given the Georgia Payday Lending Act claim in *Orubo v. Activehours, Inc.*, No. 5:24-cv-04702-PCP, 2025 WL 1257695, at *4 (N.D. Cal. Apr. 30, 2025), and applied the same logic from the Georgia cases to TILA. *See id.* at *5. The Court, however, reached its conclusion without the benefit of briefing on Georgia Senate Bill 282, "requirements for earned wage access services." In February 2025, the Georgia legislature proposed this bill to regulate EWA products. The February 2025 proposed bill is similar to prior versions proposed in the 2021 and 2023–2024 legislative sessions. Among other things, Georgia Senate Bill 282 provides that (i) no earned wage access services that comply with the proposed law "shall be considered lending activity or money transmission," and (ii) "no fees permitted under [the proposed law] shall be considered interest." Senate Bill 282, Section (d). As to the fees, Georgia Senate Bill 282 permits EWA providers to charge a per-transaction fee of the greater of $5.00 or 5% of the proceeds provided to a customer. Senate Bill 282, Section (c)(2). The fact that Georgia Senate Bill 282 encompasses EarnIn's Cash Out product shows that such products are not currently regulated by Georgia law.

[11] The Illinois legislature has "clearly stated that the PLPA should be interpreted in harmony with federal law." *In re Smith*, No. AP 24 A 00243, 2025 WL 1794127, at *7 (Bankr. N.D. Ill. June 26, 2025) (rejecting the argument that "a loan that complies with TILA nonetheless violates the PLPA, since that argument would defeat the express purpose of the PLPA"); *see* 815 ILCS 123/15-1-5 (describing the IPLPA's purpose to protect consumers "consistent with federal law and the Military Lending Act").

[12] Plaintiffs cite to the Illinois DFPR's April 30, 2021 press release to support their allegation that "wage advance products" constitute consumer loans governed by the IPLPA. FAC ¶ 54. But "wage advance products," which allow employees to borrow money against *future* wages, are fundamentally different than EarnIn's Cash Out product that gives users access to portions of their *already earned* wages. *See Osorio v. Tile Shop, LLC*, No. 15-C-15, 2018 WL 1453552, at *5 (N.D. Ill. Mar. 23, 2018), *aff'd on other grounds sub nom.*, 939 F.3d 847 (7th Cir. 2019) (defining "cash advance" under Illinois law as "a payment made to an employee before the employee has provided consideration," or, in other words, "an advance on the employee's commissions *for sales not yet made*") (emphasis added). And in any event, Plaintiffs cite an outdated press release that is no longer available on the Illinois DFPR website. *See* FAC ¶ 54 n.21.

Plaintiffs contend that the automatic debit authorization evidences a repayment obligation. FAC ¶¶ 84, 95, 101. This Court also found the debit authorization factor indicative of a repayment obligation in *Orubo*. *See* 2025 WL 1257695, at *5. But the Court did not receive any briefing in *Orubo* on a critical fact that Plaintiffs also omit from their Amended Complaint: EarnIn users ***may revoke that authorization or remove the payment method (discussed further below) at any time***, as plainly stated in both EarnIn's debit authorization form and its online help center. *See* Ex. 8; De Jarnette Decl. ¶ 11. Users can, in fact, revoke their debit authorization through the EarnIn app by contacting customer support, contrary to Plaintiffs' allegations otherwise. De Jarnette Decl. ¶ 11; FAC ¶ 99. And EarnIn users may further avoid repayment in several other ways, including de-linking or closing bank accounts or debit cards associated with EarnIn accounts, submitting stop payment orders with their banks, or closing EarnIn accounts entirely. Ex. 8; De Jarnette Decl. ¶ 11. This can be accomplished by contacting EarnIn via email or by live-chatting with EarnIn's customer support. *Id.* These product features, which extend well-beyond EarnIn's contractual language stating that there is no legal obligation to repay, confirm that EarnIn users have a "real-world" choice not to repay Cash Outs. *See Orubo*, 2025 WL 1257695, at *4 (focusing on the "real-world" significance of repayment obligations).

Courts in the Ninth Circuit hold that an "obligation" under TILA must be an *enforceable* obligation. *Gonzalez v. Specialized Loan Servicing, LLC*, 691 F. Supp. 3d 1162, 1171 (C.D. Cal. 2023); *see Edwards*, 606 F.3d at 557 (defining "obligor" under TILA as "one who is obligated to pay a debt"); *see also Obligation*, BLACK'S LAW DICTIONARY (2nd Ed. 1910) ("An obligation is a legal duty, by which a person is bound to do or not to do a certain thing."). Because users can unilaterally cancel or revoke their debit authorization, or cancel repayment in other ways, users are not "bound to" repay. Further, the Cash Out User Agreement, which is the operative agreement between EarnIn and its Cash Out users, explicitly states "**You do not have an obligation to repay any of the Cash Out Services, and EarnIn will have no legal or contractual claim or remedy against you based on your failure to repay any of the Cash Out Services.**" Ex. 1, The Cash Out Services § 7. Based on both the structure of the Cash Out product, and the terms of the legal agreement between EarnIn and its users, neither TILA nor the MLA applies. *See Harmon v. Fifth*

*Third Bancorp*, No. 1:18-cv-00402, 2020 WL 2512820, at *9 (S.D. Ohio May 15, 2020), *aff'd*, 858 F. App'x 842 (6th Cir. 2021) (holding that where a consumer "has no liability . . . for losses associated with [an advance]," such an advance is not "credit" within the meaning of TILA); *see also* 12 C.F.R. § 1026.17(b) (TILA disclosures made "before consummation of the transaction");[13] 12 C.F.R. § 1026.2(a)(13) ("Consummation means the time that a consumer becomes contractually obligated on a credit transaction."). For the same reasons, there can be no "unpaid balance" as is required for the IPLPA to apply. 815 ICLS 123/15-5-5 ("[A] lender shall not contract for or receive charges exceeding a 36% annual percentage rate on the unpaid balance of the amount financed for a loan."). Here, there is no enforceable repayment obligation, and therefore no unpaid balance. Illinois case law confirms that where repayment is not required, there is no loan at all. *See, e.g.*, *Osorio*, 2018 WL 1453552, at *5 (finding that a draw on plaintiff's future earnings issued through payroll was not a loan where plaintiff's employer "does not always require repayment" because "if a payor isn't going to ask for his money back, that doesn't sound much like a loan"); *In re Marriage of Caminiti*, 2019 IL App (1st) 171563-U, ¶ 85 (a "loan" that "does not require repayment, is more typically considered a 'gift'").

Indeed, if advancing funds and merely expecting repayment were sufficient to constitute "debt," investment contracts would fall within that category—courts have found they do not. For instance, in *Foster v. EquityKey Real Est. Invs. L.P.*, the court analyzed a transaction in which a purported lender advanced funds in exchange for a right that likely would have entitled it to recoup the funds—plus more—based on real-estate appreciation. No. 17-cv-00067-HRL, 2017 WL 1862527, at *4–5 (N.D. Cal. May 9, 2017). Yet, *Foster* held that the transaction was not a loan and did not create a debt; instead, the court emphasized the nature of the parties' rights and obligations. *See id.* at *4, 4 n.2 ("[Plaintiffs] do not currently owe [defendant] any debt. Further, there is no guarantee that the payment received by [plaintiffs] need ever be returned."); *see also Est. of Bolles v. Comm'r of I.R.S.*, No. 22-70192, 2024 WL 1364177, at *1 (9th Cir. Apr. 1, 2024) ("[An intra-family] bona fide creditor-debtor relationship . . . [is] characterized by 'a real expectation of repayment and intent to enforce the collection of the indebtedness.'") (citations omitted).

---

[13] *See* 32 C.F.R. § 232.13(a) (MLA applies to "consumer credit consummated").

Like the investors in *Foster*, EarnIn's users have no obligation to repay—and face no meaningful consequences if they do not. *See* 2017 WL 1862527, at *4. Rather, EarnIn advances funds pursuant to a contract and hopes for repayment. *See* Ex. 1, The Cash Out Services § 7. And as described above, EarnIn implements many distinct product features that give users a variety of ways to avoid repaying Cash Outs, without bearing any meaningful financial consequences.

### 2. The High Repayment Rate Shows that EarnIn Users Value Cash Outs, Not that Users Have an Obligation to Repay EarnIn

The high repayment rate cited by Plaintiffs (*see* FAC ¶¶ 101–102) does not alter the analysis. Rather, it underscores that EarnIn users ***value*** the Cash Out product and wish to continue using it—as Plaintiffs themselves have repeatedly done since filing suit. *See* Exs. 6, 7.

As EarnIn states in its Cash Out User Agreement, if a user decides not to repay, EarnIn "will not (i) engage in any debt collection activities if Cash Out Services are not repaid on the scheduled date, (ii) place the amount of the outstanding Cash Out Services as a debt with, or sell it to, a third party, or (iii) provide any reporting to a consumer reporting agency concerning the amount of the Cash Out Services." Ex. 1, The Cash Out Services § 7. These terms are fundamentally different from those of a loan or extension of credit, where the lender has legal recourse, and interest continues to accrue after nonpayment. Ex. 2 at 3; Ex. 3 at 4–5. They also distinguish EWA products from payday loans. Unlike payday lenders, who may sue for repayment and charge interest on late payments, EarnIn does neither. *See* Ex. 2 at 3; Ex. 1, The Cash Out Services § 7. If a user does not repay a Cash Out, EarnIn limits its losses solely by preventing the user from receiving further Cash Outs. *See* Ex. 1, The Cash Out Services § 7. Indeed, EarnIn does not conduct a credit check prior to issuing Cash Outs, nor does it engage in credit reporting, unlike traditional payday loans. *See id.*

Plaintiffs attempt to distract from these realities by alleging that EarnIn ensures repayment through "underwriting procedures" that include ensuring users remain employed. *See* FAC ¶¶ 88–94, 97. But these allegations only highlight Plaintiffs' central misunderstanding of what the Cash Out product is. Because Cash Out advances wages that users have already earned, it necessarily follows that users must be employed—and earning wages—to access the product in the first place. *See* Ex. 1, The Cash Out Services § 1.

Plaintiffs themselves cite a podcast in which EarnIn's CEO explained the process plainly: "[t]he underwriting essentially is figuring out [if] somebody's working and earning money or not." Ex. 10; *see* FAC ¶ 90 n.36. Plaintiffs, however, lift certain statements from that podcast out of context—using brackets to add words never spoken—in an effort to portray Cash Out as involving minimal risk of non-payment.[14] *See* FAC ¶ 90. But in actuality, the CEO said the opposite: that EarnIn does, in fact, face "some risk and some loss," even with this employment verification step.[15] Ex. 10; FAC ¶ 90.

The distinctions between EarnIn's Cash Out product and more traditional payday loans explain the appeal of EWA products. A recent FTI Consulting survey of nearly 5,000 national EWA users found that 93% reported feeling a greater sense of financial control after using such products. *See* Ex. 9. That sense of control not only empowers users to manage their finances more effectively but also helps them avoid costlier alternatives such as payday loans. In fact, 80% of respondents said their lives had "significantly improved" after using EWA products. *Id.*

EarnIn users—including Ramirez—understand that no repayment obligation exists. According to the FTI survey, 91% of EWA users reported understanding how the product works. *See id.* Ramirez's own transaction records confirm that understanding: on at least ten occasions, he chose not to repay Cash Outs on the scheduled date. *See* Ex. 6; De Jarnette Decl. ¶ 9.[16] Ramirez

---

[14] "In considering a motion to dismiss, judicial notice of the ***full text*** of documents referenced in the complaint is proper." *Wyman v. First Am. Title Ins. Co.*, No. C 16-07079 WHA, 2017 WL 1508864, at *2 (N.D. Cal. Apr. 27, 2017) (citing *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 (9th Cir. 2003)) (emphasis added). The court need not accept conclusory allegations that contradict documents attached to or incorporated in the complaint or matters properly subject to judicial notice. *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014).

[15] The term "minimal," as used in the podcast, referred specifically to the likelihood that EarnIn would extend a Cash Out to someone who is no longer earning wages—i.e., someone ineligible to use the product in the first place. Ex. 10. This is not underwriting in the traditional sense; it's a basic eligibility check. More importantly, none of this affects the user's control over repayment. Whether employed or not, users remain free to revoke debit authorizations at any time or simply choose not to repay. *See* Ex. 8.

[16] Because the Amended Complaint summarizes Plaintiffs' Cash Out records and reprints a select portion of the podcast transcript between Peter Renton and Ram Palaniappan, both Plaintiffs' full Cash Out records and the full podcast transcript should be considered by this Court as if they were part of the Amended Complaint per the doctrine of incorporation-by-reference. The incorporation-by-reference doctrine extends to "situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." *Brand Tarzana Surgical Inst. v. Aetna Life Ins. Co.*, No. CV 18-9434 (AGRx), 2019 WL 12381185, at *2 (C.D. Cal.

does not allege that he suffered any adverse consequences as a result. In fact, he later made payments to repay his advances—presumably to maintain access to the product—and continues to use EarnIn to this day. *See* Ex. 6; De Jarnette Decl. ¶ 9.[17]

In short, EarnIn's Cash Out product does not constitute "credit" or a "loan" under TILA, the MLA, or the PLPA because it neither imposes a repayment obligation nor creates a debt—legally enforceable or otherwise. The Court should therefore dismiss Plaintiffs' TILA, MLA and PLPA claims.[18]

**B.      EarnIn's Cash Out Product Does Not Include Any Finance Charges**

Even if Cash Outs constituted "credit," which they do not, Plaintiffs still fail to adequately allege that EarnIn's optional fees—namely, tips and Lightning Speed fees—qualify as finance charges under TILA, the MLA, or the IPLPA. The TILA disclosure requirements referenced in the Amended Complaint apply only to a "creditor" who "regularly extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required[.]" 15 U.S.C. § 1602(g). Here, Cash Outs—when repaid at all—are repaid in a single installment, not "in more than four installments." *See id.* Plaintiffs do not allege otherwise.

Nor are Cash Outs subject to any "finance charge[s]" as defined in Regulation Z or the

---

May 13, 2019) (citing *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)). A court need not accept conclusory allegations that contradict documents attached to or incorporated in the complaint or matters subject to judicial notice. *Gonzalez*, 759 F.3d at 1115.

[17] Plaintiffs' continued use of the Cash Out product even after filing this lawsuit, *see supra* at 7–8, also defeats their standing to bring a TILA claim. Plaintiffs allege only that EarnIn failed to make the disclosures required by TILA. FAC ¶¶ 145–46. But that allegation, by itself, is not enough. *See Littlejohn v. Phoenix Title Loans LLC*, No. CV-18-04250-PHX-SMB, 2020 WL 2527017, at *6 (D. Ariz. May 15, 2020) ("Absent allegations establishing how Defendant's TILA violations harmed or created a material risk of harm . . . bare procedural violations allege no concrete injury."). Indeed, Plaintiffs do not allege any concrete harm, and they cannot allege they would have "behaved differently" absent the alleged TILA violation, given Plaintiffs' continued transactions after filing suit. *See Railey v. Pentagon Fed. Credit Union*, No. EDCV 22-2166 JGB (SPx), 2024 WL 3059343, at *9 (C.D. Cal. May 9, 2024) (dismissing TILA claim where plaintiff "fail[ed] to allege that she would have behaved differently or that any other downstream consequences flowed from [d]efendant's alleged TILA violation").

[18] Plaintiffs' allegation that "EarnIn uses a check or other method of access to a deposit, savings, or other financial account maintained by Plaintiffs as security for the obligations in violation of 10 U.S.C. § 987(e)(5)" also fails. FAC ¶ 138. EarnIn's debit authorization does not create a security interest in Plaintiffs' linked accounts, given Plaintiffs' ability to revoke the debit authorization at any time, for any reason. *See* Ex. 8; 12 C.F.R. § 1026.2(a)(25) ("Security interest means an interest in property that secures performance of a consumer credit obligation."); 32 C.F.R. § 232.3(s) ("Words that are not defined in this part have the same meanings given to them in Regulation Z.").

IPLPA implementing regulation. *See* 12 C.F.R. § 1026.4(a); Ill. Admin. Code tit. 38, § 215.10. Regulation Z defines finance charge as:

> [T]he cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and ***imposed*** directly or indirectly ***by*** the creditor ***as an incident to or a condition of the extension of credit.*** It does not include any charge of a type payable in a comparable cash transaction.

12 C.F.R. § 1026.4(a) (emphasis added); *see also* 32 C.F.R. § 232.3(n) (The Department of Defense rule promulgated under the MLA provides that "finance charge" under the MLA "has the same meaning as 'finance charge' in Regulation Z"); Ill. Admin. Code tit. 38, § 215.10 (the IPLPA implementing regulation employs the same definition of "finance charge" as Regulation Z but uses the word "lender" in place of "creditor"). As discussed below—and as confirmed by Plaintiffs' own transaction history—both Lightning Speed fees and tips are optional. They are neither imposed as an incident to, nor as a condition of, any extension of credit. Accordingly, they do not constitute finance charges under TILA, the MLA, or the IPLPA.

### 1.    Optional Tips Are Not Finance Charges

Tips are not finance charges under TILA, the MLA, or the IPLPA because tips are not "imposed . . . by the creditor" or "lender" as required by 12 C.F.R. § 1026.4(a) and Ill. Admin. Code tit. 38, § 215.10. *See O'Brien v. J.I. Kislak Mortg. Corp.*, 934 F. Supp. 1348, 1357 (S.D. Fla. 1996) (stating that the court "must examine the facts surrounding the imposition of that fee to determine whether the creditor either directly or indirectly *required that fee* so as to come under the definition of a finance charge") (emphasis added); *see also* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472, 54547 (Nov. 17, 2017) ("Some [EWA providers] are providing advances of funds and are doing so without charging any fees or finance charges, for instance by relying on voluntary tips."); 15 U.S.C. § 1605(a) (noting that "finance charge[s] shall not include fees and amounts" charged by third-party agents "if the creditor does not *require* the imposition of the charges") (emphasis added). A charge that the consumer may decline without consequence—and which does not affect the product received—cannot be

1    "imposed" under any fair reading of the regulations. *See also* Ill. Admin. Code tit. 38, § 215.20(b)

2    (prohibiting a lender from "impos[ing] a PLPA APR greater than 36%").

3    Here, EarnIn offers the same Cash Out product regardless of whether a user tips—and

4    regardless of how much. EarnIn neither controls nor mandates tipping in any form; tips can be $0.[19]

5    *See* Ex. 1, The Cash Out Services § 6. Plaintiffs' own transaction histories make this clear. Ramirez

6    selected 14 different tip amounts, many under $1.00, and left no tip at all in 34 transactions. *See*

7    Ex. 6. Collins chose six distinct tip amounts, left no tip in 10 transactions—including as early as

8    his second Cash Out—and tipped no more than $1.00 in about 30% of his Cash Out transactions.

9    *See* Ex. 7.

10    These patterns confirm that tipping is wholly optional, not required, and therefore not a

11    "finance charge." *See Slowjewski v. Polam Fed. Credit Union*, No. C–09–3011 JCS, 2010 WL

12    4973757, at *8–9 (N.D. Cal. Dec. 1, 2010), *aff'd sub nom. Slojewski v. Polam Fed. Credit Union*,

13    473 F. App'x 534 (9th Cir. 2012) ("Fedex/wire fees" in a mortgage refinance not finance charges

14    because there was "no evidence that these charges were required in connection with the

15    transaction.").

16    While Plaintiffs allege that EarnIn "weaponizes" behavioral economics to encourage

17    tipping, (*see* FAC ¶ 73), his own cited screenshots state plainly that tips are "optional." *See id.*

18    Plaintiffs' misleading allegation that the EarnIn app presents "default tip[]" amounts when in reality

19    the app presents various options (including for custom tips) (*Id.* ¶ 72), does not convert a voluntary

20    act into a mandatory fee—nor does it transform tips into finance charges. This point is reinforced

21    by the legal definition of "tip" under the Fair Labor Standards Act, which describes a tip as "a sum

22    presented by a customer as a gift or gratuity in recognition of some service performed for the

23    customer. . . . Whether a tip is to be given, and its amount, are matters determined solely by the

24    customer." 29 C.F.R. § 531.52(a). In fact, Cash Out users can easily forego paying tips, like when

25

26    ---

[19] Courts agree that consumers understand when a tip is optional. In *Belizaire v. Ahold U.S.A., Inc.*,

27    the court rejected the claim that Stop & Shop customers could reasonably be misled into thinking a delivery fee was a required gratuity—especially where the website disclosed that "tipping is optional." No. 18 Civ. 5020 (LGS), 2019 WL 280367, at *3 (S.D.N.Y. Jan. 22, 2019), *aff'd,* 796 F.

28    App'x 51 (2d Cir. 2020).

selecting a $0 tip amount, or revoking their debit authorization. EarnIn will even *refund* user tips *after* the Cash Out is debited when a user requests a refund. Ex. 1, The Cash Out Services § 6. And a refund has no bearing on whether the user can continue using the Cash Out product.

The regulatory record reflects this understanding. In fact, regulators have excluded optional add-ons like insurance premiums and debt cancellation fees from the definition of finance charges. 12 C.F.R. § 1026.4(d)(1)–(3). The Federal Reserve has acknowledged that some EWA providers operate without charging any finance charges—specifically "by relying on voluntary tips." 82 Fed. Reg. 54472, 54547. Therefore, Plaintiffs' attempt to recast tips as finance charges conflicts not only with case law and regulatory definitions, but also with widespread consumer understanding. Like donations in charitable and political contexts, tips are discretionary contributions—not fees "incident to" credit or imposed as a condition of its extension.[20]

Plaintiffs' allegations cannot convert a well-known, voluntary practice—completely outside EarnIn's control—into a finance charge under TILA, the MLA, or the IPLPA.

### 2. Lightning Speed Fees are Voluntary Expedite Fees, not Finance Charges

Similarly, Lightning Speed fees are not finance charges under TILA, the MLA, or the IPLPA because they are optional charges that users elect to pay if they want to receive their earned wages on an expedited basis—not for the receipt of the Cash Out itself. Put differently, the Lightning Speed delivery affects *timing*, not *terms*. Users may obtain the exact same Cash Out at no cost simply by waiting 1 to 2 business days for delivery of the funds. *See* Ex. 1, The Cash Out Services § 2. That fact is dispositive under both controlling case law and regulatory guidance.

The Eleventh Circuit's decision in *Veale v. Citibank, F.S.B.* is particularly instructive. 85 F.3d 577. There, the court held that a Federal Express mailing fee, voluntarily paid to expedite a loan refinancing, was not a finance charge. *Id.* at 579. Because the lending bank did not require the borrowers to pay the fee—and because the borrowers could choose to wait and receive their

---

[20] *See, e.g., What are ActBlue tips for?,* ACTBLUE, https://help.actblue.com/hc/en-us/articles/16869089253399-What-are-ActBlue-tips-for; *What is the suggested donation to DonorsChoose?,* DONORSCHOOSE, https://help.donorschoose.org/hc/en-us/articles/202002613-What-is-the-suggested-donation-to-DonorsChoose.

1   documents via regular mail at no cost and without any impact to the terms of their loans—the court

2   concluded the fee was not imposed "as an incident to" the extension of credit. *Id.* The same logic

3   applies here. As Plaintiffs acknowledge, EarnIn users may decline to pay the Lightning Speed fee

4   and still receive the same Cash Out. *See* FAC ¶ 68 ("users can use an EWA product without paying

5   [expedite fees]"). Indeed, Ramirez himself chose not to pay the Lightning Speed fee for at least

6   42 Cash Outs. *See* Ex. 6.

7       Other courts have reached similar conclusions. In *Slowjewski*, the court held that

8   "Fedex/wire fees" in a mortgage refinance—fees connected to the method of delivery like the

9   Lightning Speed fee here—were not finance charges because there was "no evidence that these

10  charges were required in connection with the transaction." 2010 WL 4973757, at *8–9. Likewise,

11  in *Household Credit Servs., Inc. v. Pfennig*, the Supreme Court upheld the Federal Reserve Board's

12  view that over-limit fees were not finance charges under TILA because, like here, the over-limit

13  fees were not "imposed for obtaining an extension of credit." 541 U.S. 232, 240 (2004).

14      The same principle has been applied to expedite fees. In *Vogel v. Onyx Acceptance Corp.*,

15  the Wyoming Supreme Court held that such charges are not finance charges because they do not

16  relate to the aspects of a transaction relevant to "a consumer's initial credit decision." *See* 267 P.3d

17  1057, 1069 (Wyo. 2011) (quoting *Pfennig*, 541 U.S. at 243).

18      Regulators have consistently echoed this position. The Federal Reserve Board—later the

19  CFPB—was fully aware of *Veale* when it promulgated Regulation Z yet chose not to disturb its

20  reasoning. *See* Regulation Z; Truth in Lending, 75 Fed. Reg. 58539, 58627 n.77 (Sept. 24, 2010)

21  (citing *Veale* favorably). In its Official Interpretations, the Board clarified that expedite fees for

22  credit card delivery or repayment are not finance charges where free alternatives exist. *See*

23  12 C.F.R. pt. 1026, Supp. I, Part 1 ¶¶ 6(a)(2)-2(ix)–(x) (2024); *see also* Truth in Lending, 67 Fed.

24  Reg. 72618, 72619 (proposed Dec. 6, 2002); Truth in Lending, 68 Fed. Reg. 16185, 16186–87

25  (Apr. 3, 2003). As the Board explained: "[A] fee for expedited delivery of a credit card is not

26  incidental to the extension of credit and thus is not a finance charge where the consumer requests

27  the service and the card is also available by standard mail service (or another means that is at least

28

as fast) without a fee." 68 Fed. Reg. 16185, 16187. That reasoning applies directly to EarnIn, which offers Cash Outs for free via standard delivery.

Expedite fees are also commonplace in non-credit banking contexts and are not treated as finance charges in those circumstances. Banks charge to expedite check settlement. Digital wallets routinely assess fees for expedited withdrawals.[21] Out-of-network ATM fees, wire transfers, same-day ACH payments, and real-time payment (RTP) network transactions all involve similar fees, none of which are classified as finance charges under TILA or the MLA.[22]

While *Orubo* references the CFPB's July 2024 proposed interpretive rule, which characterized "express fees" and "tip[s]" as "finance charges," *see* 2025 WL 1257695, at *7, that proposed rule has not been finalized.[23] The proposed rule therefore deserves no deference—particularly given the nearly decade-long body of regulatory guidance to the contrary and widespread opposition in comment letters pointing to its inconsistency with TILA's plain text. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) ("[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.").

Because Lightning Speed fees are optional, relate solely to the timing for delivery of the Cash Out and not the ability to access the funds themselves, they are not "finance charges" under

---

[21] *See, e.g.*, *Fees With Your Venmo Account*, Venmo, https://venmo.com/resources/our-fees/ (describing a 1.75% fee, with a minimum of $0.25 and maximum of $25 to expedite transfer from the Venmo account to a bank account) (last accessed July 24, 2025).

[22] Some state credit service laws have recognized this distinction, *see, e.g.*, Ind. Code § 24-4.5-2-202 (2024), https://iga.in.gov/laws/2023/ic/titles/24#24-4.5, as does the Board. The Board prohibited card issuers in the Credit Card Accountability Responsibility and Disclosure Act (Credit CARD Act) from imposing a separate fee to allow a consumer to repay an extension of credit or pay, unless it involved an expedited service. 12 C.F.R. § 226.10(e).

[23] In 2017, the CFPB's Payday Lending Rule excluded from TILA "programs that provide innovative access to consumers' wages," such as EWA, noting that such programs "do not seem to pose the kinds of risks and harms presented by covered loans." Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472, 54547 (Nov. 17, 2017). In 2020, the CFPB noted in an advisory opinion that "[that the expedite fee] is approximately commensurate with the prevailing expedited transfer fees for non-credit products currently charged to consumers in the market," which, in part, justified the CFPB's determination that "this fee does not bear hallmarks of fees levied alongside an extension of credit." Approval Order, CFPB (Dec. 30, 2020), https://files.consumerfinance.gov/f/documents/cfpb_payactiv_approval-order_2020-12.pdf. The CFPB then rescinded its 2020 advisory opinion this year, suggesting that the agency does not appear intent to finalize the July 2024 interpretive rule.

1   TILA, the MLA, or the IPLPA. The Court should reject Plaintiffs' attempt to relabel them as such.[24]

2   **V.     CONCLUSION**

3          Plaintiffs' claims fail because they have failed to allege that EarnIn's Cash Out product is

4   credit or a loan subject to TILA, the MLA, or the IPLPA. As detailed above, EarnIn's users repay

5   voluntarily, with no legal obligation, no interest, and without being subject to collections for

6   nonrepayment. Nor do optional tips or Lightning Speed fees convert the product into a credit

7   transaction. Tips are clearly voluntary, not imposed by EarnIn, and have no effect on the product

8   offered. Courts and regulators have long recognized that such optional payments are not finance

9   charges. The same is true for Lightning Speed fees—users can receive the same Cash Out for free

10  simply by selecting standard delivery.

11         Applying TILA, the MLA, or the IPLPA to EarnIn's Cash Out product would stretch these

12  statutes far beyond their intended scope. These laws were designed to regulate traditional credit

13  arrangements involving enforceable repayment obligations and mandatory finance charges, and to

14  mandate consumer disclosures. They were not meant to cover novel and innovative earned wage

15  access products that provide users with flexibility—not debt. Treating Cash Outs like a loan simply

16  because repayment is common ignores the legal and structural realities of the product. Indeed,

17  Plaintiffs continued use of Cash Outs—including sometimes tipping and sometimes paying for

18  Lightning Speed—***even after filing this lawsuit and amending the complaint***, underscores that

19  Plaintiffs (i) clearly understand how Cash Outs work and that there are no required fees or

20  repayment obligations, (ii) value the financial well-being benefits of Cash Outs, and (iii) seek to

21  have continued access to Cash Outs. The Amended Complaint should be dismissed.

22

23

24

25

26

27

28

---

[24] Plaintiffs plead no facts showing that EarnIn collects any charges that can be calculated to exceed any applicable APR interest cap. *See* 32 C.F.R. § 232.4(c).

COOLEY LLP
ATTORNEYS AT LAW

**NOTICE OF MOTION AND MOTION
TO DISMISS PLAINTIFFS' FAC
5:25-CV-03625-PCP**

1

Dated:  July 25, 2025                              COOLEY LLP

2

3                                                  By:/S/ William K. Pao

4                                                      William K. Pao

5                                                  *Attorneys for Defendant*
                                                   ACTIVEHOURS, INC. dba EARNIN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28