**CARNEY BATES & PULLIAM, PLLC**
Randall K. Pulliam (*pro hac vice*)
rpulliam@cbplaw.com
Lee Lowther (*pro hac vice*)
llowther@cbplaw.com
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

**JACOBSON PHILLIPS, PLLC**
Joshua R. Jacobson (*pro hac vice*)
joshua@jacobsonphillips.com
Jacob Phillips (*pro hac vice*)
jacob@jacobsonphillips.com
2277 Lee Road, Suite B
Winter Park, FL 32789
Telephone: (321) 447-6461

**CONN LAW, PC**
Elliot Conn, California Bar No. 279920
elliot@connlawpc.com
100 Bush Street, Suite 1580
San Francisco, CA 94104
Telephone: (415) 417-2780
Facsimile: (415) 358-4941

*Attorneys for Plaintiffs Felix Ramirez,*
*Michael Collins, and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FELIX RAMIREZ, and MICHAEL COLLINS, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>ACTIVEHOURS, INC. dba EARNIN<br><br>Defendant. | Case No.: 5:25-cv-03625-PCP<br><br>**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br>Date:    November 20, 2025<br>Time:    10:00 a.m.<br>Dept:    Courtroom 8, 4th Floor<br>Judge:  Hon. P. Casey Pitts |

## **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND .................................................................................2

    A.   EarnIn Makes High-Cost, Short-Term Loans to Consumers Living Paycheck-to-Paycheck. ........................................................................................................2

    B.   Lightning Speed Fees and Tips Are EarnIn's Finance-Charge Engine. ............3

    C.   EarnIn Locks in Repayment Through Linked Financial Accounts, Pre-Authorized Debits and Product Suspension. .....................................................3

    D.   EarnIn's Predatory Lending Practices Injure Active-Duty Servicemembers, Their Dependents, and Illinois Residents. ..........................................................4

III.    APPLICABLE LEGAL STANDARDS .................................................................5

IV.     RELEVANT STATUTORY BACKGROUND ......................................................5

    A.   The Military Lending Act and the Truth in Lending Act ...................................5

    B.   The Illinois Predatory Loan Prevention Act .....................................................6

V.      PLAINTIFFS HAVE SUFFICIENTLY PLEADED CLAIMS UNDER THE MLA, TILA, AND PLPA ...................................................................................................6

    A.   EarnIn's Cash Out Transactions Fit the MLA and TILA's Definitions of Consumer Credit.................................................................................................7

    B.   The Purported "Non-Recourse" Nature of Cash Out Advances Does Not Preclude Consumer Credit Treatment.............................................................10

    C.   EarnIn's Lightning Speed Fees and Tips are Finance Charges. ......................14

    D.   EarnIn's arguments do not change the above analysis. ...................................15

        i.    It is irrelevant that Defendant characterizes its charges as "optional"......................15

        ii.   Regulations about credit cards do not apply to this case. ..........................................18

        iii.  The terminated CFPB order cited by Defendant is off-point....................................18

        iv.   EarnIn's Cash Out Transactions Constitute Loans Subject to the PLPA. .................19

VI.     CONCLUSION ...................................................................................................21

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370 (4th Cir. 2022) ................................15

*Al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009) .........................................................................5

*Arrington v. Colleen, Inc.*, No. AMD 00-191, 2001 WL 3411735 (D. Md. Mar. 29, 2001)...........9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .........................................................................................5

*Beach v. Ocwen Fed. Bank*, 523 U.S. 410 (1998) ..........................................................................6

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................5

*Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261 (9th Cir. 1993).....................................................7

*Cal. Pawnbrokers Ass'n v. Carter*, 2016 WL 6599819 (E.D. Cal. Nov. 7, 2016) ......................11

*Clark v. Rent-It Corp.*, 685 F.2d 245 (8th Cir. 1982) ...................................................................10

*Cox v. Cmty. Loans of Am., Inc.*, 2014 WL 1216511 (M.D. Ga. Mar. 24, 2014) .........................11

*Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862 (N.D. Cal. 2010)...........................6

*E.C. Warner v. W. B. Foshay Co.*, 57 F.2d 656 (C.A.8 1932)......................................................14

*Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co.*, 2015 IL 117950, 43 N.E.3d 911 (Ill. 2015) .............................................................................................................................................11

*Ford Motor Credit Co. v. Cenance,* 452 U.S. 155 (1981) ...............................................................7

*Foster v. EquityKey Real Estate Invs. L.P.*, 2017 U.S. Dist. LEXIS 70958 (N.D. Cal. May 9, 2017) ...........................................................................................................................................13

*Glover v. Ocwen Loan Serv., LLC*, 127 F.4th 1278 (11th Cir. 2025)............................................15

*Golubiewski v. Activehours, Inc.*, No. 3:22-CV-02078, 2024 WL 4204272 (M.D. Pa. Sept. 16, 2024) ("*Golubiewski I*").............................................................................................................2

*Golubiewski v. Activehours, Inc.*, No. 3:22-CV-02078, 2025 WL 2484192 (M.D. Pa. Aug. 28, 2025) ("*Golubiewski II*") ...............................................................................................passim

*Gonzalez v. Specialized Loan Servicing, LLC*, 691 F. Supp. 3d 1162 (C.D. Cal. 2023)...............12

*Hamilton v. York*, 987 F. Supp. 953 (E.D. Ky. 1997)....................................................................9

*Harmon v. Fifth Third Bancorp*, 2020 WL 2512820 (S.D. Ohio May 15, 2020).........................12

*Henry v. Cash Today, Inc.*, 199 F.R.D. 566 (S.D. Tex. 2000).........................................................9

*Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232 (2004) ....................................................17

*Johnson v. Activehours, Inc.,* 2025 WL 2299425 (D. Md. Aug. 8, 2025) ...............................passim

*Lembeck v. Arvest Cent. Mortg. Co.,* 498 F. Supp. 3d 1134 (N.D. Cal. 2020)..............................15

*Loughrin v. United States*, 573 U.S. 351 (2014)............................................................................16

*Miller v. HLT Check Exchange (In re Miller)*, 215 B.R. 970 (E.D. Ky. Bkr. 1997) ......................9

*Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025)..........................................passim

*Reed v. Val-Chris Invs., Inc.*, 2011 WL 6028001 (S.D. Cal. Dec. 5, 2011) ...............................12

*Turner v. E-Z Check Cashing, Inc.*, 35 F. Supp. 2d 1042 (M.D. Tenn. 1999) ...............................8

*United States v. Wenner*, 351 F.3d 969 (9th Cir. 2003).................................................................16

*Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996) ................................................................17

*Williams v. PHH Mortg. Corp.*, 2021 WL 3556633 (S.D. Tex. Aug. 11, 2021) ...........................15

**Statutes**

10 U.S.C. § 987(a) ......................................................................................................................5, 7

10 U.S.C. § 987(b) ...........................................................................................................................5

15 U.S.C. § 1601(a) .........................................................................................................................6

15 U.S.C. § 1602 ..............................................................................................................................7

15 U.S.C. § 1602(g)(1) ....................................................................................................................6

15 U.S.C. § 1605(a) .......................................................................................................................14

32 C.F.R. § 232.3(h) .....................................................................................................................7, 8

32 C.F.R. § 232.8 .............................................................................................................................6

815 ILCS 123/15-10-10 .................................................................................................................19

815 ILCS 123/15-10-30 .................................................................................................................19

815 ILCS 123/15-1-10 ..............................................................................................................19, 20

815 ILCS 123/15-1-5 ...................................................................................................................6, 20

815 ILCS 123/15-5-15(a) ..............................................................................................................19

815 ILCS 123/15-5-20 ...................................................................................................................20

815 ILCS 123/15-5-5 ........................................................................6, 19, 20

**Other Authorities**

"Debt." *Merriam-Webster.com Dictionary*, Merriam-Webster .................................8

Consumer Financial Protection Bureau, *Payday Loans and Deposit Advance Products* 24-25

    (April 2013) .......................................................................................9

*Debt*, Black's Law Dictionary (12th ed. 2024) ......................................7

Ga. S.B. 282, § 10-1-393.20(d)..................................................11

*Incident*, Black's Law Dictionary (4th ed. 1968).................................14

*Nonrecourse*, Black's Law Dictionary (11th ed. 2019) ..........................12

U.S. Dep't of Def., *Rep. on Predatory Lending Practices Directed at Members of the Armed*

    *Forces and Their Dependents* (Aug. 9, 2006) ...............................5

**Rules**

Fed. R. Civ. P. 8(a)(2)........................................................5

**Regulations**

12 C.F.R. § 1026 ........................................................7, 12

12 C.F.R. § 1026.2(a)(17)(i) ...............................................14

12 C.F.R. § 1026.4(a)..........................................................14

12 C.F.R. § 226 ................................................................13

12 C.F.R. § 226.2(a)(14).....................................................13

32 C.F.R. § 232.3(f) ...........................................................14

32 C.F.R. § 232.3(n) ..........................................................14

61 Fed. Reg. 49237 ............................................................16

61 Fed. Reg. 49239 .......................................................16, 17

65 Fed. Reg. 17129 .........................................................8, 13

65 Fed. Reg. 17130 ............................................................13

68 Fed. Reg. 16185 ............................................................18

80 Fed. Reg. 43560 ..............................................................9

1

80 Fed. Reg. 43579 ..................................................................................................................9

82 Fed. Reg. 54472 ................................................................................................................19

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - Case No.: 5:25-cv-03625-PCP

1

## I.    INTRODUCTION

2          Defendant Activehours, Inc., doing business as EarnIn, is not a benevolent financial-

3   wellness company, and its "Cash Out" payday advances are not a "free" or "0% interest" product.

4   EarnIn is, in substance, a high-cost payday lender that has repackaged the same predatory loan

5   scheme outlawed for servicemembers in the Military Lending Act ("MLA"), prohibited by the

6   Illinois Predatory Loan Prevention Act ("PLPA"), and regulated by the Truth in Lending Act

7   ("TILA"). Through **mandatory** pre-authorized debits, relentless data-driven underwriting, and a

8   business model that saddles borrowers with finance charges averaging 334% annual percentage rate

9   ("APR"), EarnIn "grants" Plaintiffs, similarly situated servicemembers, their dependents, and other

10  borrowers "the right to incur debt and defer its payment"—the very definition of "credit" under the

11  MLA, TILA, and PLPA. Through its lending practices, EarnIn was able to collect finance charges

12  from Plaintiffs that pushed the APR beyond **1,400%,** flouting the MLA's 36% APR cap and the

13  PLPA's identical limit, as well as statutory disclosure requirements.

14         Ignoring the predatory nature of its lending scheme, EarnIn asks this Court to dismiss this

15  action by making a form-over-substance argument that Cash Out, which EarnIn markets as an

16  earned wage access ("EWA") product, is not consumer credit or a loan because users have no

17  repayment obligation, and by insisting that its "optional" expedite fees and tips are not "finance

18  charges." Each of Defendant's arguments falls short, as they ignore statutory text and its plain

19  meaning, controlling regulations, and detailed factual allegations showing that EarnIn: (i) advances

20  money only after extracting a repayment authorization, (ii) rigorously underwrites and continuously

21  monitors borrowers to ensure repayment, (iii) debits borrowers' accounts automatically on payday,

22  and (iv) disables access to further advances unless and until prior advances are repaid. Indeed, three

23  separate courts (including this Court) have held EarnIn's Cash Out transactions are consumer credit

24  subject to TILA (and, by extension, the MLA), and expedite fees and tips are finance charges. *See*

25  *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025); *Johnson v. Activehours, Inc.,*

26  No. 1:24-CV-02283-JRR, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025); *Golubiewski v.*

27  *Activehours, Inc.*, No. 3:22-CV-02078, 2025 WL 2484192 (M.D. Pa. Aug. 28, 2025) ("*Golubiewski*

28

1    *II*").[1] Plaintiffs' allegations—taken as true and drawing all reasonable inferences in their favor—

2    easily state plausible claims under the MLA, TILA, and PLPA.

3         In sum, when Defendant's self-serving labels are stripped away, the true substance of

4    EarnIn's Cash Out product is clear: (1) the Cash Out transactions allowed Plaintiffs and putative

5    Class Members to "defer payment of debt or to incur debt and defer its payment," thereby

6    constituting consumer credit; and (2) the Lightning Speed Fees and tips charged by EarnIn in

7    connection with Cash Out transactions constitute "finance charges."

8         EarnIn's Motion to Dismiss should therefore be denied in its entirety.

9    **II.    FACTUAL BACKGROUND**

10        **A.  EarnIn Makes High-Cost, Short-Term Loans to Consumers Living Paycheck-**

11            **to-Paycheck.**

12        EarnIn advertises Cash Out as a "free" or "0% interest" product that purportedly gives

13   workers early "access" to their wages. ECF No. 26 ("Am. Compl.") at ¶¶ 56–61. In practice, users

14   obtain a cash advance of no more than "$150/day (with a max of $750 per pay period)" and agree—

15   before any funds are released—to allow EarnIn to **automatically debit** the principal, plus any

16   "Lightning Speed Fee" (ranging from $3.99 to $5.99) and any "tip," from their bank account on the

17   following payday. *Id.* ¶¶ 62–74, 79, 95–96. EarnIn conditions eligibility on linking a checking

18   account to its app; confirming creditworthiness through the Plaid platform; and permitting EarnIn

19   continual, real-time access to borrowers' bank account information to ensure they will have

20   sufficient funds to repay their loans on payday. *Id.* at ¶¶ 85–97. EarnIn's CEO boasts that its

21   underwriting methodologies, *i.e.*, extending credit only to those who will repay, and only in

22   amounts that are likely to be repaid, make the risk of non-payment "very, very minimal." *Id.* ¶ 90.

23

24

25   ───────────────

     [1] Following its initial 2024 order dismissing claims under TILA (in *Golubiewski v. Activehours,*
26   *Inc.*, No. 3:22-CV-02078, 2024 WL 4204272 (M.D. Pa. Sept. 16, 2024) ("*Golubiewski I*")), the
     *Golubiewski II* court conducted "a deeper review of the law" and—joining the consensus
27   established in *Orubo* and *Johnson*—reversed course, holding that "optional" expedite fees,
     materially indistinguishable from those challenged here, constitute "finance charges" sufficient to
28   support a claim for violations of TILA (which, in turn, would support a claim under the MLA).
     2025 WL 2484192, at *6.

Indeed, a recent study confirmed EWA lenders recoup their payday loans at near perfect rates (at least 97% of the time). *Id*. ¶¶ 101–102.

### B.  Lightning Speed Fees and Tips Are EarnIn's Finance-Charge Engine.

EarnIn generates virtually all revenue from two charges imposed as an incident to each cash advance:

- *Lightning Speed Fees*—fees ranging from $5.99 (for loans between $100 and $150) to $3.99 (for loans of $100 or less) for same-day disbursements rather than the "free" one-to-three-day ACH option that is impractical for borrowers who seek immediate liquidity. EarnIn's own marketing urges users to choose the faster, fee-bearing option with promises of money arriving "today," within "minutes." *Id*. at ¶¶ 63–69; and

- *Tips*—transaction fees solicited through default amounts and behavioral blackmail that guilt users into paying. A recent study showed that lenders requesting tips on EWA products receive them in 73% of transactions, and EarnIn admits 40% of its revenue comes from tips alone. *Id*. at ¶¶ 70–74.

When Lightning Speed Fees and tips are annualized over the typical 8.8-day loan term, the effective APR for the average loan of $83.00 is 284%. *Id*. at ¶ 77. However, on a shorter loan of, say 2 days, that APR skyrockets to more than 1,400%, far above applicable usury caps. *Id*. at ¶¶ 77, and 108.

### C.  EarnIn Locks in Repayment Through Linked Financial Accounts, Pre-Authorized Debits and Product Suspension.

Before any loan proceeds are transferred to a borrower, EarnIn requires the borrower to (1) verify continuous employment, (2) verify earnings through the Plaid platform, (3) link a debit card and checking account to the EarnIn app; and (4) authorize EarnIn to automatically debit the linked account for the payday immediately following any given loan and deduct the sum of the cash-advance loan amount, Lightning Speed Fees, and tips. *Id*. at ¶¶ 84–87, 95–97, 101. Failure to repay will immediately suspend borrowers' access to future Cash Outs. *Id*. at ¶¶ 96–97.

Although EarnIn's terms of service label its cash advances as "non-recourse," the practical reality is that almost every borrower repays because EarnIn debits the account the moment wages

are deposited and withholds future advances if repayment fails. *Id*. at ¶¶ 57–60, 84–94. This method of collecting loans is highly successful. EWA lenders like EarnIn recoup their loans at least 97% of the time. *Id*. at ¶ 102. Plaintiffs' records illustrate this point. *Id*. at ¶¶ 108–110.

Moreover, after cash is advanced and repayment is scheduled, EarnIn deprives users of a mechanism for cancelling a loan repayment through the app. *Id*. at ¶ 99.

> **D. EarnIn's Predatory Lending Practices Injure Active-Duty Servicemembers, Their Dependents, and Illinois Residents.**

As detailed in the Amended Complaint, the putative Classes include active military members, their dependents, and Illinois residents who used EarnIn's Cash Out product and paid a finance charge, including Lightning Speed Fees and tips. *Id*. at ¶¶ 4, 115. EarnIn's predatory lending practices associated with its Cash Out product injured Plaintiffs and putative Class Members by, *inter alia*, charging usurious interest rates, omitting mandatory credit disclosures, and using direct account access (*i.e.*, pre-authorized debits and direct account review through Plaid) as security for loans. *Id*. at ¶¶ 6, 120, 134–140, 144–149, 153–159.

As for Plaintiffs specifically, Plaintiff Felix Ramirez, a Marine Corps Sergeant stationed in North Carolina, and Plaintiff Michael Collins, a Navy Petty Officer First Class stationed in Illinois, relied on EarnIn's loans to cover household expenses between paychecks. *Id*. at ¶¶ 103–106. EarnIn charged them Lightning Speed Fees and tips on dozens of Cash Outs, producing APRs as high as 1,459%—far exceeding the 36% caps the MLA and PLPA impose to protect servicemembers and Illinois consumers from exactly this brand of predatory lending. *Id*. at ¶¶ 107–111.

The harms associated with EWA products like EarnIn are well-documented. Studies confirm that products like Cash Out significantly harm borrowers' financial health both in the sense that these products foster dependence and rampant repeat borrowing, and in the sense that overdrafts on other accounts "increased 56% on average after use of an advance product." *Id.* ¶¶ 82–83. That is exactly *why* Congress passed (and President Bush signed) the Military Lending Act: to protect

1  service members like Plaintiffs from these harms. *See* DoD Report[2] at 3 (noting predatory loans

2  "strip earnings or savings from the borrower; place the borrower's key assets at undue risk; do not

3  help the borrower resolve their financial shortfall; trap the borrower in a cycle of debt; and leave

4  the borrower in worse financial shape").

## III.   APPLICABLE LEGAL STANDARDS

6         Under Rule 8(a)(2), the plaintiff need only set forth a "short and plain statement of the claim

7  showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . .

8  claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

9  (2007). A claim is adequately pled where, taking all well-pleaded factual allegations as true, the

10  complaint contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v.*

11  *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In reviewing a complaint for

12  failure to state a claim, courts accept all facts alleged in the complaint as true and draw reasonable

13  inferences in favor of the plaintiff. *Al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009).

## IV.   RELEVANT STATUTORY BACKGROUND

### A.  The Military Lending Act and the Truth in Lending Act

16         In 2006, the Department of Defense published its Report on predatory lending practices

17  affecting the military—with a special emphasis on payday loans—finding "[p]redatory lending

18  undermines military readiness, harms the morale of troops and their families, and adds to the cost

19  of fielding an all volunteer fighting force." DoD Report, at 53.

20         Enacted in response to this report, the MLA protects servicemembers and their dependents

21  by, among other things, making it illegal for creditors to "impose an annual percentage rate of

22  interest greater than 36 percent with respect to the consumer credit extended to" those persons. 10

23  U.S.C. § 987(b); *see* DoD Report at 7. The MLA applies to "covered members"—which include

24  members of the armed forces on active-duty and on active Guard and Reserve Duty—and their

25  dependents. 10 U.S.C. §§ 987(a), (i)(1), (2). The MLA's implementing regulations specify that it

26

27  _____

28  [2] U.S. DEP'T OF DEF., *Rep. on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (Aug. 9, 2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf [https://perma.cc/NAC5-D97H] ("DoD Report").

1  applies to entities, like Defendant, engaged in "payday loan transactions." 32 C.F.R. § 232.8(a).

2  Yet Defendant issues payday loan transactions with military APR charges far exceeding the MLA's

3  usury cap.

4       "Congress enacted TILA to promote 'the informed use of credit' by consumers." *Davenport*

5  *v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 872 (N.D. Cal. 2010) (quoting 15 U.S.C. §

6  1601(a)). TILA was designed to "assure a meaningful disclosure of credit terms" to facilitate

7  informed decisions by consumers and guard against unfair credit practices. *Beach v. Ocwen Fed.*

8  *Bank*, 523 U.S. 410, 412 (1998) (quoting 15 U.S.C. § 1601(a)). TILA's disclosure requirements

9  apply to creditors that regularly extend credit subject to a "finance charge." 15 U.S.C. § 1602(g)(1).

10      EarnIn provides no such disclosures.

11      **B.  The Illinois Predatory Loan Prevention Act**

12      Recognizing the havoc predatory lending was having on Illinois residents, the Illinois

13  legislature enacted the PLPA in March 2021. The PLPA adopted the same 36% cap found in the

14  MLA (*see* 815 ILCS 123/15-1-5 and 815 ILCS 123/15-5-5); prior to this, Illinois law permitted

15  payday lenders to charge triple-digit APRs—often 300% or more—on small-dollar, short-term

16  loans. The PLPA establishes a clear public policy that "No person or entity may engage in any

17  device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to .

18  . . making loans disguised" as non-loan transactions. 815 ILCS 123/15-5-15.

19  **V.   PLAINTIFFS HAVE SUFFICIENTLY PLEADED CLAIMS UNDER THE MLA,**

20  **TILA, AND PLPA**

21      The Amended Complaint states plausible claims under the MLA, TILA, and PLPA. EarnIn

22  argues that Plaintiffs' claims are deficient on two grounds: (1) they do not plausibly allege that

23  EarnIn's Cash Out product constitutes consumer credit or a loan because they include a "non-

24  recourse" clause, and (2) Cash Out is not subject to a "finance charge" or interest because EarnIn

25  offers an alternative non-expedited version of Cash Out that takes days to process and does not

26  "require" tips. These very arguments were made by EarnIn and rejected by this Court in *Orubo* (*see*

27  780 F. Supp. 3d 927), *Johnson* (*see* 2025 WL 2299425), and *Golubiewski II* (*see* 2025 WL

28  2484192). In *Orubo*, this Court rightly rejected EarnIn's argument that its product did not constitute

1    consumer credit or a loan, as "contrary to both longstanding regulations . . . and the parties'

2    expectations." 780 F. Supp. 3d at 935. In addition, the Court correctly held that because EarnIn's

3    Lightning Speed Fees and tip charges were "incident to" the extensions of credit, both charges

4    qualify as "finance charges." *Id.* at 936–38. The same is true here.

5        **A. EarnIn's Cash Out Transactions Fit the MLA and TILA's Definitions of**

6           **Consumer Credit.**

7        Whether a transaction is "consumer credit" turns on substance, not labels. *Burnett v. Ala*

8    *Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (courts must "[look] past the form of the

9    transactions to their economic substance in deciding whether [TILA] [applies].") (citing *Ford*

10    *Motor Credit Co. v. Cenance,* 452 U.S. 155, 157–58 (1981)).

11        Thus, Defendant's self-serving labels notwithstanding, EarnIn's Cash Out transactions fall

12    squarely within the MLA's and TILA's definitions of consumer credit.

13        The MLA applies to the "extension of consumer credit" to "covered members" and their

14    dependents. *See* 10 U.S.C. § 987(a). The MLA adopts the consumer credit definition "provided . .

15    . in regulations" by the DoD. *Id.* § 987(i)(6). Those regulations define "consumer credit" as "credit

16    offered or extended to a covered borrower primarily for personal, family, or household purposes,

17    and that is: (i) subject to a finance charge; or (ii) payable by a written agreement in more than four

18    installments." 32 C.F.R. § 232.3(f)(1).

19        In turn, the MLA's regulations define "credit" as "the right granted to a consumer by a

20    creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). This

21    definition is substantively identical to the "credit" definition provided under the TILA. *See* 15

22    U.S.C. § 1602. Regulation Z further "clarifies that '[c]redit includes a transaction in which a cash

23    advance is made to a consumer ... in exchange for the consumer's authorization to debit the

24    consumer's deposit account, and where the parties agree ... that the ... deposit account will not be

25    debited [] until a designated future date.'" *Orubo*, 780 F. Supp. 3d at 935 (quoting 12 C.F.R. pt.

26    1026, Supp. I, Paragraph 2(a)(14) Credit, ¶ 2 ("Payday loans; deferred presentment")). This

27    comports with the plain meaning of "debt," defined as "[l]iability on a claim; a specific sum of

28    money due by agreement or otherwise." *Debt*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also*

7

"Debt." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/debt. Accessed 29 Aug. 2025 (defining "debt" as "something owed; obligation," or "a state of being under obligation to pay or repay someone or something in return for something received; a state of owing.").

Here, the Amended Complaint sufficiently pleads that EarnIn's Cash Out transactions allowed Plaintiffs to "defer payment of debt or to incur debt and defer its payment," thereby constituting consumer credit. *See* 32 C.F.R. § 232.3(h). EarnIn advances money in exchange for a promise to repay (backed by mandatory pre-authorized debits to linked bank accounts) a specific amount due days later. Am. Compl., ¶¶ 3–5, and 91–97. This Court and *Johnson* have already held that the same Cash Out transactions at issue here meet TILA's "credit" definition. *See Orubo*, 780 F. Supp. 3d at 935; *Johnson*, 2025 WL 2299425, at *8. The same result should obtain here.

Tellingly, EarnIn does not dispute that it made a cash advance in exchange for the consumer's authorization to debit the consumer's account at a later date. Rather, EarnIn argues that this is insufficient to evidence a repayment obligation, and the Court got it wrong in *Orubo*. *Id*. at 18–23. EarnIn's position ignores the economic realities of its Cash Out transactions and exalts form over substance. The *Orubo* opinion correctly found that accepting EarnIn's form-over-substance argument would undermine the MLA and TILA's statutory objectives and encourage lenders to evade these statutory protections through semantic sleight-of-hand. 780 F. Supp. 3d at 936, n.5. For the same reasons, this Court should reject Defendant's self-serving labels and find that EarnIn's Cash Out transactions function as consumer credit.

The Federal Reserve Board's ("FRB") official commentary in Regulation Z noted above was issued in response to a novel-at-the-time wave of "payday loans," including so-called "deferred presentment" transactions. 65 Fed. Reg. 17129. The opinions considering whether such transactions constitute consumer credit lend further support. In a deferred presentment transaction, the lender advances cash to the borrower in a "principal" amount. *Turner v. E-Z Check Cashing, Inc.*, 35 F. Supp. 2d 1042, 1045 (M.D. Tenn. 1999). Simultaneously, the borrower writes the lender a check which includes repayment of the principal along with a service fee. *Id.* The borrower agrees to repay the principal and service fee (by letting the lender cash the check or by another method). *Id.* Courts

considering such transactions "held, without exception, that deferred presentment transactions are extensions of 'credit' under TILA." *See, e.g.*, *Id.* at 1047; *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 571 (S.D. Tex. 2000) ("Courts have standardly held that deferred presentment transactions are extensions of credit under TILA."); *Hamilton v. York*, 987 F. Supp. 953 (E.D. Ky. 1997) (transactions where borrowers "obtain[ed] cash from [the lender] today" and repaid "substantial sums of money over time" constituted consumer credit under TILA); *Arrington v. Colleen, Inc.*, No. AMD 00-191, 2001 WL 3411735, at *3 (D. Md. Mar. 29, 2001) (similar) (collecting cases).

Likewise, the Department of Defense has noted "[m]ost, if not all, 'deposit advance' products would (when offered to a covered borrower) be covered as consumer credit because this type of product typically involves credit extended by a creditor primarily for personal, family, or household purposes for which the borrower pays any fee or charge that is, or is expected to be, repaid from funds available in the borrower's asset account held by that creditor." 80 Fed. Reg. 43560, 43561, 43579–80 (July 22, 2015). Deposit advances are "typically structured as short-term loans," where borrowers "stipulate that repayment will automatically be taken out of the borrower's next [] electronic deposit [*i.e.*, paycheck]."[3]

EarnIn's Cash Out transactions are functionally identical to deferred presentment transactions and deposit advances. In each case, lenders advance cash to borrowers, who in turn (i) agree to repay and (ii) are required to provide repayment authorization when the cash is advanced. Put simply, EarnIn "disburs[es] funds to people like the plaintiff on the promise of repayment of the sum plus the 'service charge,' at a later time. If this is not an extension of credit, [it is] hard to imagine any transaction that is." *Miller v. HLT Check Exchange (In re Miller)*, 215 B.R. 970, 974 (E.D. Ky. Bkr. 1997); 80 Fed. Reg. 43579; *accord Orubo*, 780 F. Supp. 3d at 935; *see also Johnson*, 2025 WL 2299425, at *8. Accordingly, EarnIn's Cash Out transactions constitute consumer credit under the applicable statutory, regulatory, jurisprudential, and commonsense understanding of the term.

---

[3] Consumer Financial Protection Bureau, *Payday Loans and Deposit Advance Products* 24-25 (April 2013), available at http://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf.

**B. The Purported "Non-Recourse" Nature of Cash Out Advances Does Not Preclude Consumer Credit Treatment.**

EarnIn argues its Cash Out advances are not credit because of a provision in its terms of service stating "You do not have an obligation to repay any of the Cash Out Services, and EarnIn will have no legal or contractual claim or remedy against you based on your failure to repay any of the Cash Out Services." ECF No. 35 at 14:24-26. However, EarnIn's attempt to hide behind a "non-recourse" subterfuge specifically designed to skirt regulation applicable to credit fails. Nothing in the MLA, TILA, or Regulation Z limits "credit" to "recourse" obligations.

As noted above, this Court must look to the *substance* of the transaction to determine whether the Cash Out transactions constitute consumer credit. *See, e.g.*, *Orubo*, 780 F. Supp. 3d at 936, n.5 (compiling cases); *Clark v. Rent-It Corp.*, 685 F.2d 245, 248 (8th Cir. 1982) ("The legislative history of the TILA shows that Congress was aware that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish." (cleaned up)).

Paying heed to the "credit" definitions discussed *supra*, this Court has already rejected EarnIn's argument that only recourse loans constitute consumer credit for at least three reasons: (1) limiting the meaning of consumer credit to recourse loans "would insert into the statutory text language found nowhere therein"; (2) exempting these evident loan transactions from TILA would "disregard[] Regulation Z entirely"; and (3) doing so would "contradict TILA's very purpose, which properly informs the construction of its terms." *Orubo*, 780 F. Supp. 3d at 936. The District of Maryland agreed. *See Johnson,* 2025 WL 2299425, at *8. These decisions are on all fours with this case considering the MLA embraces a "credit" definition substantively identical to TILA's.

EarnIn strains to argue *Orubo* is not controlling, invoking a Georgia Senate bill that died in committee. ECF No. 35, at 13, n.10 (citing Ga. S.B. 282, https://legiscan.com/GA/bill/SB282/2025). EarnIn claims, "The fact that Georgia Senate Bill 282 encompasses EarnIn's Cash Out product shows that such products are not currently regulated by Georgia law." *Id.* Respectfully, no it doesn't. If anything, the opposite is true: the text of the dead statute would have exempted EWA products that complied with the code—Cash Out would not, in any event—from Georgia

1    laws applicable to lending activity or loans. *See* Ga. S.B. 282, § 10-1-393.20(d). Put simply, if EWA

2    products were not loans under existing Georgia law, there would be no reason to write a statute

3    providing that they are not loans.

4           EarnIn's borrowers are functionally obligated to repay advances, and EarnIn's "disavowal

5    of any *legal* repayment obligation is no[t] determinative in interpreting TILA [or the MLA] …

6    given the steps EarnIn takes to ensure it will be repaid [] notwithstanding the absence of legal

7    recourse." *Orubo*, 780 F. Supp. 3d at 936. Indeed, "borrowers can only obtain advances after EarnIn

8    takes thorough steps to ensure repayment" and "the circumstances under which repayment would

9    not occur are extremely narrow" and unlikely to occur. *Id.* at 933. EarnIn's CEO admits these

10   measures make the risk of non-payment "very, very minimal." Am. Compl. at ¶ 90. It is "entirely

11   possible that EarnIn's system is in fact *more* effective in guaranteeing repayment than one that

12   depended on pursuing legal debt collection remedies." *Id.* at 936, n.4; *Johnson,* 2025 WL 2299425,

13   at *8 (same). EarnIn's Cash Out product constitutes "credit" under TILA and the MLA, and

14   Defendant has proffered no justification to hold otherwise.

15          *Orubo* and *Johnson* are far from the only courts to reject a defendant's attempt to evade the

16   credit label by characterizing a financial product as non-recourse and thereby supposedly not giving

17   rise to "debt." *See, e.g., Cox v. Cmty. Loans of Am., Inc.*, No. 4:11-CV-177 (CDL), 2014 WL

18   1216511, at *17 (M.D. Ga. Mar. 24, 2014) (finding "non-recourse" pawn transactions and "pledge"

19   loans constituted "'consumer credit' transactions within the meaning of the MLA" where the

20   borrower "did not face any personal liability in connection with [either type of] transaction"); *Cal.

21   Pawnbrokers Ass'n v. Carter*, No. 2:16-cv-02141-JAM-KJN, 2016 WL 6599819, at *3 (E.D. Cal.

22   Nov. 7, 2016) (same, under both MLA and TILA); *Fin. Freedom Acquisition, LLC v. Std. Bank &

23   Tr. Co.*, 2015 IL 117950 ¶¶ 26–27, 43 N.E.3d 911, 918 (Ill. 2015) (noting "[r]everse mortgages are

24   consumer credit transactions and clearly covered by TILA" even though they are "nonrecourse").

25   A lender that advances money based on a repayment promise—as in the pledge loan, pawn

26   transaction, reverse mortgage contexts, and as with Defendant's Cash Outs—extends credit

27   regardless of "non-recourse" labels. *See Id.*

28

The authorities relied upon by Defendant are both irrelevant and unpersuasive. Initially, EarnIn erroneously claims an "obligation" under TILA and the MLA must be enforceable in court. However, the FRB's commentary interpreting Regulation Z clarifies that a "legal obligation" may encompass an obligation "deemed unenforceable." 12 C.F.R. § 1026, Supp. I, ¶ 5(c)(1)(ii). Legal enforceability is therefore not mandatory to constitute credit under Regulation Z.

Likewise, *Gonzalez v. Specialized Loan Servicing, LLC*, 691 F. Supp. 3d 1162 (C.D. Cal. 2023), cited by EarnIn, supports Plaintiffs' position insofar as it held a nonrecourse loan is an "enforceable obligation" against a borrower, making him an "obligor" under the TILA. *Id.* at 1171. Further, as a definitional matter, "nonrecourse" describes a type of "obligation." "Nonrecourse" means "[o]f, relating to, or involving an *obligation* that can be satisfied only out of the collateral securing the obligation and not out of the debtor's other assets." *Nonrecourse*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). That a lender waives recourse through the court system to enforce an obligation does not mean there is no "obligation" or that there is nothing "owed" to begin with.

EarnIn's reliance on *Reed v. Val-Chris Invs., Inc.*, No. 11CV371 BEN WMC, 2011 WL 6028001 (S.D. Cal. Dec. 5, 2011) (*see* ECF No. 35 at 18:24–19:5), is misplaced since the *Reed* plaintiff made no promise (recourse or otherwise) to pay money in the future. That case instead dealt with pure assignments of benefits held by a third party.

*Harmon v. Fifth Third Bancorp*, No. 18-CV-00402, 2020 WL 2512820 (S.D. Ohio May 15, 2020) is similarly irrelevant. *Harmon* involved fees paid for immediate access to checks cashed via mobile deposit that were guaranteed in the event the deposit bounced. In other words, the bank was not lending money at all, but offering, for a fee, the depositor faster access to his or her own deposited funds. The bank, further, guaranteed the deposit and the customer did not assume any responsibility to repay the check amount after it was deposited. So the fee at issue was paid for the specific purpose of not incurring a debt if the check bounced. The *Johnson* court addressed *Harmon* and, after noting these differences, found it "materially distinguished" from the EWA fact pattern present here. *Johnson*, 2025 WL 2299425, at *8, n.6. The court also pointed out that Regulation Z

1   expressly provides that the "contemporaneous check-cashing" fact pattern at play in *Harmon* is not

2   credit. *See id.* (quoting Truth in Lending, 65 Fed. Reg. 17129, 17130 (Mar. 31, 2000)).

3       In *Foster v. EquityKey Real Estate Invs. L.P.*, No. 17-cv-00067-HRL, 2017 U.S. Dist.

4   LEXIS 70958 (N.D. Cal. May 9, 2017), the court found that a bona fide options contract was not

5   consumer credit. *Id.* at *9–*14. The court noted Regulation Z excludes an "investment plan" from

6   the definition of consumer credit and the FRB "explain[ed] that certain situations are 'not

7   considered credit,'" including the "execution of options contracts" and "investment plans." *Id.* at

8   *9, *14 (first citing 12 C.F.R. § 226.2(a)(14), then citing 12 C.F.R. § 226, Supplement I, Subpart

9   A, 2(a)(14)). The instant case is the inverse of *Foster*—the FRB has expressly determined cash

10  advances materially identical to Cash Out advance are credit and there is no exception under

11  Regulation Z for "non-recourse payday loans."

12      Defendant continues its self-serving characterizations of its Cash Out transactions by

13  arguing that the high repayment rate simply demonstrates that users "value" Cash Out, not that

14  users have an obligation to repay. ECF No. 35 at 22:6–10. In so arguing, EarnIn ventures far outside

15  the pleadings, citing studies from industry advocacy groups, and further asks the Court to

16  strenuously construe inferences in its favor. That is not how 12(b)(6) motions work.

17      In sum, EarnIn's decision to waive some of its remedies for recouping its debts does not

18  change the analysis. Plaintiffs were obligated to repay the loans they took from EarnIn, regardless

19  of whether there were clever, albeit impractical and almost entirely unused, ways to weasel out of

20  repayment obligations. Thus, EarnIn struggles to portray avoiding repayment obligations as

21  straightforward and clearly disclosed, invoking materials far beyond the pleadings, and far from

22  supporting its claims.

23      Defendant's contention that Plaintiff Ramirez's transaction records "confirms" that no

24  repayment obligation exists because "he chose not to repay Cash Outs on the scheduled date"

25  misstates both applicable law and the factual record. As set forth above, courts do not "interpret

26  'credit' to require a legal obligation to repay." *See Johnson,* 2025 WL 2299425, at *8 (quoting

27  *Orubo*). Similarly, the fact that Ramirez was late to repay some of his Cash Out loans, if anything,

28  *confirms* that repayment was both expected and realized. Indeed, Exhibit 6 to the De Jarnette

1    Declaration makes clear that Plaintiff Ramirez was obligated to repay outstanding loans to receive

2    another Cash Out and did so. *See* ECF No. 36-6.

3         Rather, EarnIn's "*non-recourse* payday loan" product is precisely the sort of "cunningly

4    devised" "subterfuge" that courts hold *does not* change the true character of an evident credit

5    transaction. *See E.C. Warner v. W. B. Foshay Co.*, 57 F.2d 656, 659 (C.A.8 1932).

6              **C.  EarnIn's Lightning Speed Fees and Tips are Finance Charges.**

7         Under the MLA and TILA, Lightning Speed Fees and tips are finance charges because they

8    are fees charged as an "incident to or a condition of" Cash Out credit transactions.

9         To be considered consumer credit under the MLA and to fall under TILA, the credit must

10   be payable in more than four installments *or* subject to a finance charge. 32 C.F.R. § 232.3(f); *cf.*

11   12 C.F.R. § 1026.2(a)(17)(i) (defining "creditor" under TILA). Only the latter element of the

12   disjunctive—the finance charge—is relevant here. Defendant's Cash Out product is subject to a

13   "finance charge," which is defined as:

14        the cost of consumer credit as a dollar amount. It includes ***any charge*** payable
          directly or indirectly by the consumer and imposed directly or indirectly by the
15        creditor as an incident[4] to or a condition of the extension of credit.

16   12 C.F.R. § 1026.4(a) (emphasis added); 32 C.F.R. § 232.3(n); *accord* 15 U.S.C. § 1605(a).

17        Lightning Speed Fees and tips are both finance charges under this definition (*i.e.*, any charge

18   payable to the creditor "as an incident to or a condition of" the credit). This is so because Lightning

19   Speed Fees and tips are "charge[s] payable directly [] by the consumer and imposed directly [] by

20   the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a); *accord*

21   15 U.S.C. § 1605(a). *Orubo*, *Johnson*, and *Golubiewski II* agreed, finding "voluntary" expedite fees

22   and tips for instant access to cash advances constituted finance charges because they were an

23   "incident [*i.e.*, connected] to" the credit extended. *See Orubo*, 780 F. Supp. 3d at 936–39, at *7;

24   *Johnson*, 2025 WL 2299425, at *8–9; *Golubiewski II*, 2025 WL 2484192, at *6. After all, "incident

25   to" contemplates a "necessary *connection*" with, not a "necessary *condition*" of, the credit product.

26

27   _____

28   [4] When TILA was enacted, "incident" was defined as simply "anything which is usually connected
     with another, or connected for some purposes, though not inseparably." *Incident*, BLACK'S LAW
     DICTIONARY (4th ed. 1968).

*Orubo*, 780 F. Supp. 3d at 937. This framing comports with the applicable definitions and the MLA's and TILA's remedial purposes, which "strongly caution[] against construing 'incident to' so narrowly as to exclude all but absolutely necessary conditions." *Id.* at 938.

This Court's decision in *Orubo* is on all fours. The plaintiff there pleaded "a close connection between payment of the tip and the lightning fee, on the one hand, and [Defendant's] extension of a same-day cash advance, on the other." *Id.* The Court further found the defendant's "voluntary" expedite fee was "effectively mandatory" to receive instant credit, just as it is here. *Id.* The same, of course, is true here. Am. Compl., ¶¶ 80–103.

The conclusion that EarnIn's Lightning Speed Fees and tips are finance charges is bolstered by cases construing the term "incidental to" a debt in the context of the FDCPA and analogous state laws. Courts interpreting such laws have held fees a borrower agrees to pay in making loan payments online or over the phone are "incidental" to the underlying debt, and are thus prohibited, even if the fees are optional. *See, e.g.*, *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 377, n.2 (4th Cir. 2022) ("[W]e have a hard time seeing how the convenience fee is not incidental to the debt. Without the mortgage payment, there is of course no convenience fee."); *Glover v. Ocwen Loan Serv., LLC*, 127 F.4th 1278, 1290, n.13 (11th Cir. 2025) (same); *Lembeck v. Arvest Cent. Mortg. Co.*, 498 F. Supp. 3d 1134, 1136 (N.D. Cal. 2020) ("The only plausible reading of the word 'incidental' in this context is as a reference to something that is connected to but far less significant than the underlying debt. That describes the [Pay-to-Pay] fee well."); *see also Williams v. PHH Mortg. Corp.*, No. 4:20-CV-04018, 2021 WL 3556633, at *5 (S.D. Tex. Aug. 11, 2021) (finding collection of optional fees "incidental to" debt and citing dictionary definitions of "incidental").

### D.  EarnIn's arguments do not change the above analysis.

#### i.    It is irrelevant that Defendant characterizes its charges as "optional"

EarnIn's contrary argument—that Lightning Speed Fees and tips do not constitute "finance charges" because they are optional—is unpersuasive. ECF No. 35 at 25:15–29:16.

First, and most fundamentally, EarnIn's claim that only "mandatory" fees constitute finance charges is at odds with the statutory definition of "finance charge," which uses the disjunctive "or"

to separate charges imposed as (1) an incident to credit, *or* (2) a condition of credit. *See Loughrin v. United States*, 573 U.S. 351, 357 (2014) (disjunctive "or" signals that "words it connects are to be given separate meanings"). Accepting EarnIn's interpretation would defy this rule and render the words "incident to" superfluous. *See United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003) ("[A] statute should not be construed so as to render any of its provisions mere surplusage.").

On this very issue, this Court, *Johnson*, and *Golubiewski II* each found EarnIn's purported "voluntary" Lightning Speed Fees and tips constitute finance charges because they are an "incident [*i.e.*, connected] to" the credit extended, rejecting EarnIn's argument that only mandatory fees count. *Orubo*, 780 F. Supp. 3d at 938; *Johnson,* 2025 WL 2299425, at *8; *Golubiewski II*, 2025 WL 2484192, at *6. Just as in each of these cases, Plaintiffs have pleaded "a close connection between payment of the tip and the lightning fee, on the one hand, and EarnIn's extension of a same-day cash advance, on the other." *Orubo*, 780 F. Supp. 3d at 938; *Johnson,* 2025 WL 2299425, at *8; *Golubiewski II*, 2025 WL 2484192, at *6.

So, *Orubo*, *Johnson*, and *Golubiewski II* are directly on point and confirm EarnIn's Lightning Speed Fees and tips are finance charges. Consistent with *Orubo*, Plaintiffs here allege EarnIn's Lightning Speed Fees and tips are "inextricably intertwined" with receiving instant Cash Out transactions. 780 F. Supp. 3d at 938.[5] The time and manner by which funds are disbursed are "material term[s] of credit" (*see id*.), and Plaintiffs allege Lightning Speed Fees and tips are unavoidable to unlock the instant-funding loan product that EarnIn offers. Am. Compl. at ¶¶ 63–68; *see also Truth in Lending*, 61 Fed. Reg. 49239.

Earnin's argument about its "optional" fees ignores the FRB's long recognition, noted in *Orubo*, 780 F. Supp. 3d at 938, that "optional charges" can be part of the finance charge: "[E]ven though a lender ***may not require*** a particular loan feature, the feature may become a term of the credit if it is included." *Truth in Lending*, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996) (emphases

---

[5] With respect to tips, it is the "borrower's effort to obtain a cash advance that triggers EarnIn's solicitation of a tip; EarnIn's users are solicited for a tip, sometimes multiple times, before they can obtain a cash advance; the design of the EarnIn app makes it difficult for users to obtain an advance without paying a tip; and EarnIn's representations imply that the tip is necessary[.]" *Orubo*, 780 F. Supp. 3d at 938.

1    added). So, where a feature is not required but "is included for an additional charge . . . , that amount

2    properly represents part of the finance charge for that particular loan, even though less costly loans

3    may be available without that feature. . . ." *Id.* This analysis is salient to the Lightning Speed Fee.

4    Even assuming EarnIn may not "require" borrowers to pay the finance charge to unlock the instant-

5    funding feature, borrowers who use the instant version of Cash Out must pay "an additional charge[,

6    and thus] that amount properly represents part of the finance charge for that particular loan, even

7    though less costly loans may be available without [the instant delivery] feature." *See Truth in*

8    *Lending*, 61 Fed. Reg. 49239.

9        Notably, in arguing that its Lightning Speed Fees and tips are not finance charges, EarnIn

10    fails to distinguish the holdings in *Orubo* and *Johnson* finding EarnIn's Lightning Speed Fees and

11    tips are finance charges. *See* ECF No. 35 at 18–-24. And while Defendant mentions *Golubiewski I*

12    (which supported Defendant's finance charge argument) several times in its brief, that order has

13    been superseded by *Golubiewski II*, which sided with *Orubo* and *Johnson*. 2025 WL 2484192, at

14    *6.

15        *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232 (2004), which Defendant claims

16    supports its position, is in accord. There, the Supreme Court held that the term "incident to" in the

17    definition of finance charge requires a "necessary connection"—not a necessary *condition*—

18    between the charge and the credit extended. To date, three of three courts have agreed (in cases

19    involving "optional" fees charged by EarnIn) that *Pfennig* does not require that fees be mandatory

20    to constitute finance charges. *See Orubo*, 780 F. Supp. 3d at 937–38; *Johnson*, 2025 WL 2299425,

21    at *9, n.7; *Golubiewski II*, 2025 WL 2484192, at *6.

22        Defendant's citation to *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996), does not

23    change the analysis about "optional fees." *See* ECF No. 35 at 21:22-22:2. There, the Veales

24    refinanced their home by securing a $361,800.00 loan from Citibank, using the loans proceeds to

25    pay off other lenders. *Id.* at 578. Citibank charged a $21.00 fee—characterized variously as an

26    "Airborne fee" and "Federal Express Charge" (the "FedEx fee")—to ship checks to pay off the

27    other pre-refinanced creditors. *Id.* at 578–79. The plaintiffs claimed the FedEx fee was an

28    undisclosed finance charge, a proposition the Eleventh Circuit rejected: the FedEx fee at issue was

both optional *and* unrelated to the Citibank credit product generally or as to any "particular feature." Indeed, the fee merely reimbursed Citibank for shipping charges incurred to mail checks drawn from the refinanced loan to the original third-party creditors after the loan was funded. That the FedEx fee is not "incident to" the loan can be seen by considering a counterfactual where the Veales had to mail checks to their mortgagees themselves. In such hypothetical, Citibank's credit product would be *precisely the same*—same amount issued on the same date—and the Veales would have gone to FedEx (or some other courier) to pay for shipping the payoff checks themselves. The FedEx fee thus was not "incident to" the extension of credit.

Unlike the FedEx fee, borrowers *cannot* access the instant-funding version of Cash Out without paying Lightning Speed Fees. EarnIn's Lightning Speed Fees unlock a "particular feature" of the consumer credit product as opposed to merely offsetting a postage fee to mail loan proceeds to third parties *after* a loan is issued. Further, tips are paid in direct connection with Cash Out advances, not to offset ancillary fees (like a post-loan issuance courier fee). *Veale* is inapposite.

   *ii. Regulations about credit cards do not apply to this case.*

Defendant also invokes a regulation holding "fees for expediting delivery of a credit or charge card" are not finance charges "where the consumer requests the service and the card is also available by standard mail service." ECF No. 35, at 28:25-29:2; 68 Fed. Reg. 16185, 16186–87 (Apr. 3, 2003). But Lightning Speed Fees and tips do not fit the exception since they are not "fees for expediting delivery of a credit or charge card."

   *iii. The terminated CFPB order cited by Defendant is off-point.*

Defendant also cites a terminated CFPB order addressing a wholly different fee charged by an employer-partnered EWA provider. ECF No. 35 at 23, n.23. That order held a $1.00 fee for access to an EWA product "did not bear hallmarks of" a finance charge because it was nominal, comparable to transfer fees for non-credit products, and did "not vary based on factors such as the amount of the transaction." Approval Order, CFPB, at 5 (Dec. 30, 2020), https://files.consumerfinance.gov/f/documents/cfpb_payactiv_approval-order_2020-12.pdf. Defendants' Lightning Speed Fees and tips fit none of these criteria. *See* Am. Compl., ¶¶ 63–77.

Defendant also cherry-picks facially useful language from a 2017 CFPB ruling that obliquely references "newly formed" EWA companies that purportedly "provid[e] advances of funds and are doing so without charging any fees or finance charges, for instance by relying on voluntary tips." ECF No. 35 at 21 (citing 82 Fed. Reg. 54472, 54547). EarnIn omits that this ruling is, at best, outdated considering the CFPB's subsequent proposed interpretive rule holding that tips and expedite fees identical to EarnIn's *are* finance charges.

At bottom, EarnIn argues its Lightning Speed Fees and tips are not connected to the Cash Out transactions because they are not *mandatory*. The entire argument is a non-sequitur. Both fees are plainly finance charges under the MLA's definition of interest and also satisfy Regulation Z's "incident to or a condition of" requirement. Borrowers "must pay" Lightning Speed Fees to access Cash Out *instantly* and are solicited, cajoled, and coaxed throughout the Cash Out app and user experience to pay tips *in connection with* advances. Lightning Speed Fees and tips are thus finance charges.

        *iv.*    *EarnIn's Cash Out Transactions Constitute Loans Subject to the PLPA.*

The PLPA emulates the MLA by, *inter alia*, prohibiting lenders from "receiv[ing] charges exceeding a 36% annual percentage rate" on consumer loans—the same cap prescribed by the MLA. 815 ILCS 123/15-5-5. The PLPA defines "loan" broadly:

> "Loan" means money or credit provided to a consumer in exchange for the consumer's agreement to a certain set of terms, including, but not limited to, any finance charges, interest, or other conditions. "Loan" includes closed-end and open-end credit, retail installment sales contracts, motor vehicle retail installment sales contracts, and any transaction conducted via any medium whatsoever, including, but not limited to, paper, facsimile, Internet, or telephone. "Loan" does not include a commercial loan.

815 ILCS 123/15-1-10.

The PLPA includes a "no evasion" section prohibiting any person from "engag[ing] in any device, subterfuge, or pretense to evade the requirements of this Act" through "*any method.*" 815 ILCS 123/15-5-15(a). The statute preempts conflicting state laws or administrative rules, if any. 815 ILCS 123/15-10-10; 815 ILCS 123/15-10-30.

Notably, the PLPA delegates authority to draft, adopt, and enforce rules and regulations applying the statute to the Illinois Department of Financial Regulation ("DFPR"). 815 ILCS

123/15-1-10; 815 ILCS 123/15-5-20. When the PLPA was enacted, the DFPR put out a press release declaring the "PLPA covers many types of consumer loans, which include . . . ***wage advance products***." *See* Am. Compl. at ¶ 54 and Ex. 1 thereto. While Defendant suggests that this press release is "outdated" (see ECF No. 35 at 13, n.12), it provides no authority to suggest that this release has been pulled or is otherwise not the current position of the DFPR.

Put simply, Cash Out is a loan under the PLPA because it is "money or credit provided to a consumer in exchange for the consumer's agreement to a certain set of terms, including . . . any finance charges, interest, or other conditions." *See* 815 ILCS 123/15-1-10. As the DFPR observed, "wage advance products" like Cash Out fit comfortably within this definition. *See* Am. Compl. at ¶ 54 and Ex. 1 thereto.

Echoing its non-recourse arguments made with respect to the MLA and TILA, EarnIn argues that there is no "unpaid balance" on its loans as it claims is required for the PLPA to apply. *See* ECF No. 35 at 15 (citing 815 ILCS 123/15-5-5). Initially, this "unpaid balance" language stems from the PLPA's provision setting forth an interest rate cap, *not* a "recourse" requirement: "a lender shall not contract for or receive charges exceeding a 36% annual percentage rate on the *unpaid balance* of the amount financed for a loan." 815 ILCS 123/15-5-5. For obvious reasons, EarnIn does not challenge that its Lighting Speed Fees and tips, if considered finance charges, are usurious under the PLPA.

Even if the "unpaid balance" language were construed to require a "balance" due on a loan to trigger PLPA application, Plaintiffs easily clear that hurdle. Whenever Plaintiffs took a Cash Out advance, they had an "unpaid balance" that they were required to pay, agreed to pay, and had to provide pre-authorized debit authorization to facilitate repayment. The notion that no "balance" was due simply because EarnIn disavowed legal collection remedies should Plaintiffs have found a way to default has no basis in the text of the statute or its evident purpose. The Illinois Legislature expressly stated that "[t]he purpose of this [PLPA] Act is to protect consumers from predatory loans consistent with federal law and the Military Lending Act which protects active-duty members of the military." *See* 815 ILCS 123/15-1-5 (further providing "This Act shall be liberally construed to effectuate its purpose."). Thus, for the same reasons Plaintiffs sufficiently alleged "consumer

PLS.' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - Case No.: 5:25-cv-03625-PCP

credit" under the MLA and TILA, Plaintiffs have sufficiently alleged EarnIn issued loans to Plaintiffs and the putative Class Members. *See Orubo*, 780 F. Supp. 3d at 934 (finding similar allegations were "sufficient to plead that EarnIn's cash advances are loans for purposes of the GPLA.").

Since the PLPA incorporates the MLA's definition of "finance charge," EarnIn restates its argument that Cash Out transactions are not subject to finance charges under the PLPA because its fees and tips are "optional." In a similar vein, Plaintiffs incorporate their arguments above demonstrating Lightning Speed Fees and tips are finance charges under the MLA, TILA, and PLPA.

## VI.     CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

Dated:  August 29, 2025                          Respectfully submitted,

                                                        */s/ Elliot Conn*
                                                **CONN LAW, PC**
                                                Elliot Conn, California Bar No. 279920
                                                elliot@connlawpc.com
                                                100 Bush Street, Suite 1580
                                                San Francisco, CA 94104
                                                Telephone: (415) 417-2780
                                                Facsimile: (415) 358-4941

                                                Lee Lowther (*pro hac vice*)
                                                **CARNEY BATES & PULLIAM, PLLC**
                                                llowther@cbplaw.com
                                                Randall K. Pulliam (*pro hac vice*)
                                                rpulliam@cbplaw.com
                                                One Allied Drive, Suite 1400
                                                Little Rock, AR 72202
                                                Telephone: (501) 312-8500
                                                Facsimile: (501) 312-8505

                                                **JACOBSON PHILLIPS, PLLC**
                                                Joshua R. Jacobson (*pro hac vice*)
                                                joshua@jacobsonphillips.com
                                                Jacob Phillips (*pro hac vice*)
                                                jacob@jacobsonphillips.com
                                                2277 Lee Rd., Ste. B
                                                Winter Park, FL 32789
                                                Telephone: (321) 447-6461

                                                *Attorneys for Plaintiffs FELIX RAMIREZ,*
                                                *MICHAEL COLLINS, and the Proposed Classes*